**Ex parte Jose Garcia BRISENO,
Applicant.**

No. 29819–03.

Court of Criminal Appeals of Texas.

Feb. 11, 2004.

Richard H. Burr, Leggett, for Appellant.

Jose M. Rubio, Jr., DA, Laredo, Matthew Paul, State's Attorney, Austin, for State.

## ORDER

COCHRAN, J., delivered the Order of the Court, joined by KELLER, P.J., MEYERS, PRICE, WOMACK, JOHNSON, KEASLER, and HERVEY, JJ.

Applicant was convicted of capital murder and sentenced to death for the 1991 robbery-murder of Dimmitt County Sheriff Ben Murray. After the Supreme Court's decision in Atkins v. Virginia,[1] applicant filed a subsequent writ of habeas corpus application alleging that he was mentally retarded and therefore exempt from execution. Based upon applicant's prima facie showing, we remanded his writ application to the convicting court for further proceedings. The trial court conducted a lengthy evidentiary hearing and made findings of fact that applicant failed to prove, by a preponderance of the evidence, that he is mentally retarded. We agree and therefore deny relief.

## I.

The evidence at applicant's capital murder trial showed that Sheriff Ben Murray was robbed and murdered in his home during the night of January 5, 1991. Sheriff Murray had been stabbed numerous times and then shot in the head. His pistol, a "Thompson" pistol, and an unknown amount of money were taken. Applicant was arrested the next day. A sample of blood taken from the sheriff's carpet matched applicant's blood, and a sample of blood taken from applicant's clothing matched the sheriff's blood.

While in jail on this charge, applicant suggested an escape plan to another inmate, Ricardo Basaldua.[2] Applicant, who was a jail trustee, obtained a knife and gave it to Basaldua. Applicant instructed him to tell one of the jailors that he, Basaldua, needed to wash some clothes. Then, according to applicant's plan, once Basaldua was outside his cell, he was to grab the jailor's keys and release applicant. Basaldua did so, but he stabbed the jailor when the jailor refused to hand over his jail and truck keys. Applicant, Basaldua, and a third prisoner, Roy Garcia, escaped in the jailer's truck. Applicant drove. They abandoned the truck behind a Wal–Mart in a different town, and applicant led them to a tree where he dug up the gun that he had used to kill Sheriff Murray. Applicant found food and water for the three men who then hid in the woods for three days. During this time, Roy Garcia had two epileptic seizures. Applicant told Basaldua that they needed to kill Garcia because he would only slow them down, but Basaldua said, "No." Finally, police surrounded the escapees who hid in the grass, and applicant threw away the gun before they were recaptured. Basaldua then led the officers to where applicant had thrown his gun. According to Basaldua, applicant was the planner and ringleader of the escape.

After his capture, Basaldua told the police what applicant had told him about the murder of Sheriff Murray. According to Basaldua, applicant and a cohort, Alberto Gonzales, appeared at the Sheriff's home offering to sell some rings.[3] Applicant and

---

1. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

2. Basaldua testified to these events at the 2003 Atkins hearing as well as at the capital murder trial.

3. A few weeks before his murder, Sheriff Murray spoke with applicant about an ongoing burglary investigation he was conducting. The burglary involved the theft of jewelry, including some rings, valued at over $40,000. Sheriff Murray wanted to enlist applicant's help in solving the burglary case, but a deputy

Gonzales did not actually have any rings to sell, but they used this as a ruse to get into the Sheriff's home. Once inside, a struggle began, and they stabbed the Sheriff. Then applicant grabbed the Sheriff's pistol and shot him. They found some money "on" or "between" the walls of the Sheriff's home. According to Basaldua, applicant had hidden the money he stole from the Sheriff's home and promised to share it with Basaldua if he helped applicant escape from jail.

The jury convicted applicant of capital murder and, based upon their answers to the special punishment issues, the trial court sentenced him to death. We upheld that conviction and sentence in a unanimous unpublished opinion.[4] Applicant filed his original habeas corpus writ application on July 31, 1995. This Court denied relief based on the trial court's findings of fact and conclusions of law on November 27, 1996. Thereafter, applicant filed a writ of habeas corpus in the federal district court, but that too, was denied, and the Fifth Circuit affirmed the district court's judgment on November 26, 2001.

■ Applicant filed this subsequent writ application on July 10, 2002, the date he was scheduled to be executed, alleging that

he was mentally retarded and therefore his execution was constitutionally impermissible under *Atkins v. Virginia.* We issued a stay of execution and remanded the writ application to the convicting court to conduct an evidentiary hearing on applicant's *Atkins* claim. The trial judge who had presided over applicant's capital murder trial conducted a five-day evidentiary hearing on the question of whether applicant was mentally retarded.[5] On October 7, 2003, the trial court made findings of fact and concluded that:

> The Applicant, Jose Garcia Briseno, is not mentally retarded, and the State of Texas is therefore not precluded from carrying out the sentence of death in accordance with the verdict of the jury in the trial court.[6]

The trial court forwarded the habeas record to this Court for a final determination on whether to grant or deny relief under *Atkins.*

## II.

This Court does not, under normal circumstances, create law. We interpret and apply the law as written by the Texas Legislature or as announced by the United States Supreme Court. In *Atkins,* the

---

sheriff suggested that this was not a good idea.

4. *Briseno v. State,* No. 71,489 (Tex.Crim.App. 1994) (not designated for publication).

5. In his objections to the trial court's findings of fact, applicant complains that the trial judge "appeared to have predetermined the issue before him," because he cautioned the defense team to keep pens and pencils out of applicant's reach. Applicant argues that the trial judge was concerned that applicant might attempt to escape "because he is going to be put to death anyway." But, as the trial court noted, the *Atkins* evidentiary hearing has "nothing to do with dangerousness; it has to do with mental retardation[.]" Because a jury had already found applicant

guilty of capital murder and found that he was dangerous, we cannot conclude that the trial judge's safety concerns reflected any prejudice against applicant regarding his mental retardation claim.

6. Applicant also complains that, in orally announcing his ruling, the trial court reflected bias because it "said nothing about its reasoning in reaching the conclusion it reached." We fail to see evidence of judicial bias. Just as a jury returns a verdict without additional comment or explanation, a trial judge need not orally explain the evidentiary basis for his ruling from the bench. In the context of a habeas hearing, the judge's written findings of fact and conclusions of law suffice as the basis for his ruling.

Supreme Court announced that there is a national consensus that those who suffer from mental retardation should be exempt from the death penalty, but it simultaneously left to the individual states the substantive and procedural mechanisms to implement that decision. The Texas Legislature has not yet enacted legislation to carry out the *Atkins* mandate. Nonetheless, this Court must now deal with a significant number of pending habeas corpus applications claiming that the death row inmate suffers from mental retardation and thus is exempt from execution.[7] Recognizing that "justice delayed is justice denied" to the inmate, to the victims and their families, and to society at large, we must act during this legislative interregnum to provide the bench and bar with temporary judicial guidelines in addressing *Atkins* claims.[8] Thus, we set out the following judicial standards for courts considering those claims under article 11.071.[9]

## A. Defining "mental retardation" for purposes of *Atkins*.

As the Supreme Court had previously noted, the mentally retarded are not "all cut from the same pattern ... they range from those whose disability is not immediately evident to those who must be constantly cared for."[10] In *Atkins*, the Supreme Court noted that any "serious disagreement about the execution of mentally retarded offenders ... is in determining which offenders are in fact retarded."[11] Reasoning that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus,"[12] the Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences."[13]

The term "mental retardation" encompasses a large and diverse population suffering from some form of mental disability. The DSM–IV[14] categorizes the mentally retarded into four subcategories: mildly mentally retarded, moderately mentally retarded, severely mentally retarded, and profoundly mentally retarded.[15] Some 85% of those officially categorized as mentally retarded fall into the highest group,

---

7. At last count, this Court has remanded thirty-five subsequent writ applications to the convicting court for further proceedings under *Atkins* because the applicant had made a prima facie showing of possible mental retardation. A significant number of these death row inmates had their federal habeas corpus applications dismissed from federal court so they could return to Texas courts to exhaust their *Atkins* claims before a possible return to federal court. These federal courts are also waiting for Texas to establish this state's substantive and procedural implementation of *Atkins*.

8. *See, e.g., Ex parte Jordan,* 758 S.W.2d 250 (Tex.Crim.App.1988) (setting out judicial guidelines and procedures to address "incompetency to be executed" habeas corpus claims under *Ford v. Wainwright* because Legislature had not yet enacted statute to implement Supreme Court decision).

9. *See, e.g., State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014 (2002) (judicially setting out substantive standards and procedural guidelines for determining *Atkins* claims "[i]n the absence of a statutory framework to determine mental retardation").

10. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

11. *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242.

12. *Id.*

13. *Id.*

14. AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed. 2000) (DSM–IV).

15. *Id.* at 41–42.

those mildly mentally retarded,[16] but "mental retardation is not necessarily a lifelong disorder."[17] The functioning level of those who are mildly mentally retarded is likely to improve with supplemental social services and assistance.[18] It is thus understandable that those in the mental health profession should define mental retardation broadly to provide an adequate safety net for those who are at the margin and might well become mentally-unimpaired citizens if given additional social services support.

We, however, must define that level and degree of mental retardation at which a consensus of Texas citizens would agree that a person should be exempted from the death penalty. Most Texas citizens might agree that Steinbeck's Lennie[19] should, by virtue of his lack of reasoning ability and adaptive skills, be exempt. But, does a consensus of Texas citizens agree that all persons who might legitimately qualify for assistance under the social services definition of mental retardation be exempt from an otherwise constitutional penalty? Put another way, is there a national or Texas consensus that all of those persons whom the mental health profession might diag-

nose as meeting the criteria for mental retardation are automatically less morally culpable than those who just barely miss meeting those criteria? Is there, and should there be, a "mental retardation" bright-line exemption from our state's maximum statutory punishment? As a court dealing with individual cases and litigants, we decline to answer that normative question without significantly greater assistance from the citizenry acting through its Legislature.

Although Texas does not yet have any statutory provisions to implement the *Atkins* decision, the 77th Legislature passed House Bill 236 in 2001, even before the *Atkins* decision was announced, which would have prohibited the execution of mentally retarded defendants convicted of capital murder and sentenced to death.[20] That bill adopted the definition of mental retardation found in TEX. HEALTH & SAFETY CODE § 591.003(13): " 'mental retardation' means significant subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."[21] This bill, however, was vetoed by the Governor. The 78th Texas Legislature did not

16. *Id.* at 41.

17. *Id.* at 44.

18. *Id.* (noting that "[i]ndividuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation").

19. *See* JOHN STEINBECK, OF MICE AND MEN (1937).

20. Tex. H.B. 236, 77th Leg., R.S. (2001).

21. Under HB 236, a capital murder defendant could raise the issue of mental retardation only if he had given notice to the court and the State of his intent to raise the issue at

least 30 days prior to the start of trial, and requested a special "mental retardation" jury issue under art. 37.071 § 2(e)(2).

HB 236 also provided for a possible post-verdict hearing before the trial court if the jury rejected the defendant's mental retardation claim. The court would appoint two disinterested experts, "experienced and qualified in the field of diagnosing mental retardation to examine the defendant and determine whether the defendant is a person with mental retardation." At this hearing, the court would consider the findings of the experts and independently determine if the defendant was mentally retarded by a preponderance of the evidence. If the court found, by a preponderance of the evidence, that the defendant was mentally retarded, the trial court would sentence the defendant to life in prison despite the jury's finding of no mental retardation.

pass a statute implementing *Atkins*, although several bills were introduced and considered.[22]

This Court has previously employed the definitions of "mental retardation" set out by the American Association on Mental Retardation (AAMR), and that contained in section 591.003(13) of the Texas Health and Safety Code.[23] Under the AAMR definition, mental retardation is a disability characterized by: (1) "significantly subav- erage" general intellectual functioning;[24] (2) accompanied by "related" limitations in adaptive functioning;[25] (3) the onset of which occurs prior to the age of 18.[26] As noted above, the definition under the Texas Health and Safety Code is similar: " 'mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."[27]

**22.** The 78th Legislature modified its previous attempt at implementing the United States Supreme Court's decision in *Atkins* in House Bill 614. *Compare* Tex. H.B. 236, 77th Leg, R.S. (2001) *with* Tex. H.B. 614, 78th Leg., R.S. (2003). The most noticeable differences between those two bills were the creation of article 37.072 in H.B. 614 and the elimination of any post-verdict judicial determination of mental retardation after the jury's determination.

House Bill 614 defined "mental retardation" as "significantly subaverage general intellectual functioning that is concurrent with significant deficits in adaptive behavior, if those characteristics originate during the developmental period." Tex. H.B., 78th Leg., R.S. (2003). This definition does not differ significantly from that found in the Health and Safety Code. *See* Tex. Health & Safety Code § 591.003(13).

Like H.B. 236, H.B. 614 required pre-trial notice of the intent to raise an issue of mental retardation, but, under the latter bill, the defendant was required to file notice at least 60 days before jury selection began and was required to accompany that notice with "objective evidence indicating that the defendant may be a person with mental retardation."

H.B. 614 also contained a provision for a mental retardation special issue, in which the jury was instructed that the defendant would be required to prove mental retardation by a preponderance of the evidence.

Neither of these bills addressed the issue of determining mental retardation claims on a post-conviction habeas corpus writ brought by inmates sentenced to death before the Supreme Court decision in *Atkins*.

**23.** *See Ex parte Tennard*, 960 S.W.2d 57, 60– 61 (Tex.Crim.App.1997), *cert. granted on other grounds sub nom. Tennard v. Dretke*, —— U.S.

——, 124 S.Ct. 383, 157 L.Ed.2d 275 (2003); *see also id.* at 64–65 (Meyers, J., concurring).

**24.** "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)." DSM–IV at 39; *see also* American Association on Mental Deficiency (AAMD), Classification in Mental Retardation 1 (Grossman ed.1983). Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded. AAMD at 23. Furthermore, IQ tests differ in content and accuracy. *Id.* at 56–57. *But see State v. Lott*, 779 N.E.2d at 1015 (holding that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her I.Q. is above 70").

**25.** "Impairments in adaptive behavior are defined as *significant limitations in an individu-al's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales.*" AAMD at 11. Under section 591.003(1): " 'adaptive behavior' means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."

**26.** AAMR, Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992).

**27.** Tex. Health & Safety Code § 591.003(13)

8

■ Some might question whether the same definition of mental retardation that is used for providing psychological assistance, social services, and financial aid is appropriate for use in criminal trials to decide whether execution of a particular person would be constitutionally excessive punishment.[28] However, that definitional question[29] is not before us in this case because applicant, the State, and the trial court all used the AAMR definition. Until the Texas Legislature provides an alternate statutory definition of "mental retardation" for use in capital sentencing, we will follow the AAMR or section 591.003(13) criteria in addressing *Atkins* mental retardation claims.

■ The adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder:

- Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?
- Putting aside any heinousness or gruesomeness surrounding the capital

28. For example, the definition of legal "insanity" in TEX. PEN.CODE § 8.01 is not at all the same type of definition that is used in psychiatry or social services for mental illnesses. *See* TEX. PEN.CODE § 8.01(a) (providing that "[i]t is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong"). Moreover, TEX. PEN.CODE § 8.01(b) provides that "[t]he term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." Similarly, the legal standards used to determine competency to stand trial or to be executed are not the same standards used in psychiatry or the mental health professions to determine whether a person has a severe mental disability. *See* TEX.CODE CRIM. PROC. art. 46.02 § 1A(a) ("[a] person is incompetent to stand trial if the person does not have: (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a

rational as well as factual understanding of the proceedings"); *id.* art. 46.05(h) ("A defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed").

29. The social sciences definition of mental retardation has been in a state of flux for over 65 years, as evidenced by the definitions dating from Tredgold (1908, 1937) and Doll (1941, 1947) to the current AAMR 10th edition definition. MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 19 (10th ed.2002). *See State v. Williams*, 831 So.2d 835, 838 n. 2 (La.2002) (noting that "there is current dissatisfaction with the term 'mental retardation,' but there has been no consensus on a substitute term"). Given the importance and impact of *Atkins* upon the criminal justice and the mental health and mental retardation systems, that definitional flux may well continue.

offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.[30]

**B.** *Atkins* **does not require a jury determination of mental retardation in a post-conviction proceeding.**

Applicant requested that a jury be empaneled to decide the factual issue of his claim of mental retardation. The convicting court denied this request, as did we. We conclude that there is no mechanism

set out in our applicable habeas statute, article 11.071, that provides for a jury trial of an issue first raised in a post-conviction habeas corpus proceeding.[31]

Applicant contends that he was entitled to a jury determination of mental retardation pursuant to the Supreme Court's recent decision in *Ring v. Arizona*[32] combined with *Atkins*. For the following reasons, we disagree and hold that *Ring* and *Atkins* do not require a post-conviction jury determination of applicant's claim of mental retardation.

■ First, we conclude that *Ring* does not have retroactive effect in a post-conviction habeas corpus application.[33] Even if the holding of *Atkins* applied retroactively and may allow a person sentenced to death under Texas law to have a claim of mental retardation first addressed under article 11.071,[34] we join those courts that have held that the Supreme Court's decision in

---

30. *See Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (U.S.Kan. 2002) (noting that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law"); *Williams*, 831 So.2d at 859 (in determining *Atkins* claim, "the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts").

31. *See, e.g., Ex parte Jordan*, 758 S.W.2d 250, 254 (Tex.Crim.App.1988) (applauding trial court's "scrupulous" action on post-conviction writ of habeas corpus in effectuating the intent of *Ford v. Wainwright* and judicially addressing factual question of defendant's competency to be executed "even in the absence of statutory law").

32. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (holding that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt").

33. *See In re Johnson*, 334 F.3d 403, 404–05 n. 1 (5th Cir.2003) (noting that the Fifth Circuit had previously held that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (U.S.2000) did not announce a new rule of substantive law and thus was not applicable to convictions that became final before its announcement, thus *Ring* logically ought not apply retroactively to *Atkins* claims); *Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613, 619 (2003) (refusing to apply *Ring* retroactively to *Atkins* claims); *Walton v. Johnson*, 269 F.Supp.2d 692, 698 n. 3 (W.D.Va.2003) (noting that *Ring* does not apply to *Atkins* claims).

34. See, e.g., *Hill v. Anderson*, 300 F.3d 679, 681 (6th Cir.2002) (stating that *Atkins* applies retroactively); *Clemons v. State*, —— So.2d ——, 2003 WL 22047260, *3, 2003 Ala.Crim. App. LEXIS 217, *8 (Ala.Crim.App.2003); *Williams v. State*, 793 N.E.2d 1019, 1027 (Ind.2003); *Russell v. State*, 849 So.2d 95 (Miss.2003); *Johnson v. State*, 102 S.W.3d 535 (Mo.2003); *State v. Dunn*, 831 So.2d 862 (La.2002); *State v. Lott*, 97 Ohio St.3d 303, 779 N.E.2d 1011(2002).

*Ring,* requiring a jury determination of every fact that increases the maximum statutory penalty, is not retroactively applicable to cases on post-conviction habeas corpus review.[35]

■ Second, even if *Ring* were retroactive, that case does not establish a constitutional requirement that a jury determine the question of mental retardation.[36] A lack of mental retardation is not an implied element of the crime of capital murder which the State is required to prove before it may impose a sentence above the maximum statutory punishment for that crime.[37] Instead, as the Supreme Court made explicit in *Atkins,* proof of mental retardation "exempts" one from the death penalty, the maximum statutory punishment for capital murder.[38] There was certainly no indication from the Supreme Court in *Atkins* that the fact of mental retardation is one that a jury, rather than a judge, must make. Indeed, as one state court has noted:

> the majority of states which have provided a statutory exemption from capital punishment for the mentally retarded have made the finding of mental retardation a matter for the trial judge as opposed to the jury.[39]

**35.** *See, e.g., Turner v. Crosby,* 339 F.3d 1247, 1279–86 (11th Cir.2003) (holding that *Ring* is not retroactive absent an express pronouncement by the Supreme Court to that effect); *Moore v. Kinney,* 320 F.3d 767, 771 n. 3 (8th Cir.2003), *cert. denied,* 539 U.S. 930, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003) (holding that *Ring* will not be applied retroactively absent an express pronouncement from the Supreme Court); *State v. Towery,* 204 Ariz. 386, 64 P.3d 828, 835 (2003) ("[t]he new rule of criminal procedure announced in *Ring* ... does not meet either of the exceptions to *Teague's* general rule that new rules do not apply retroactively to cases that have become final"); *Colwell v. State,* 118 Nev. 807, 59 P.3d 463, 470–73 (2002) (adopting a *Teague*-based retroactivity test and concluding that "retroactive application of *Ring* on collateral review is not warranted"); *but see Summerlin v. Stewart,* 341 F.3d 1082, 1084 (9th Cir.2003) (holding that *Ring* does apply retroactively), *cert. granted sub nom. Schriro v. Summerlin,* —— U.S. ——, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003).

**36.** *See In re Johnson,* 334 F.3d at 404–05 (concluding that "neither *Ring* and *Apprendi* nor *Atkins* render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt"); *Head v. Hill,* 587 S.E.2d at 619 (concluding that "the absence of mental retardation is not the functional equivalent of an element of an offense such that determining its absence or presence requires a jury trial under *Ring* "); *Walton v.*

*Johnson,* 269 F.Supp.2d at 698 n. 3 (stating that "the determination of mental retardation does not increase the penalty for the crime beyond the statutory maximum and thus it is not the equivalent of an element of the offense for *Apprendi* purposes").

**37.** *See id.*

**38.** *Atkins,* 536 U.S. at 320, 122 S.Ct. 2242; *see also State v. Williams* 831 So.2d 835, 860, n. 35 (La.2002) ("*Atkins*" explicitly addressed mental retardation as an exemption from capital punishment, not as a fact the *absence* of which operates "as the functional equivalent of an element of a greater offense," thus a jury determination of that fact is not required).

**39.** *State v. Williams,* 831 So.2d at 860 & n. 35 (noting that "the Supreme Court would unquestionably look askance at a suggestion that in *Atkins* it had acted as a super legislature imposing on all of the states with capital punishment the requirement that they prove as an aggravating circumstance that the defendant has normal intelligence and adaptive functions"); *compare Murphy v. State,* 66 P.3d 456, 457 (Okla.2003) (stating that if defendant raises sufficient evidence to create a factual claim of mental retardation, issue must be submitted to a jury to be decided at a hearing held solely on the issue of mental retardation; because defendant failed to show "significant" adaptive limitations or "substantially" limited intelligence, trial court did not err in declining to empanel jury).

Had the Supreme Court, in its survey of these statutes in *Atkins*, found them constitutionally defective, it surely would have said so. Instead, the Supreme Court explicitly left " 'to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.' " [40]

■ Third, our state habeas statute does not provide for a jury determination of fact issues on post-conviction habeas corpus review. Instead, it requires the convicting court to address and determine all previously unresolved factual issues. [41] It is within the Legislature's prerogative to enact a statute requiring or allowing a jury determination of mental retardation on post-conviction review, but unless it does so, we must follow the Legislature's current statutory procedures. [42] Thus, we hold that, when an inmate sentenced to death files a habeas corpus application raising a cognizable *Atkins* claim, the factual merit of that claim should be determined by the judge of the convicting court. His findings of fact and conclusions of law shall be reviewed by this Court in accordance with article 11.071, § 11. [43]

**40.** *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).

**41.** Tex.Code Crim. Proc. art. 11.071, § 9(a) ("If the convicting court determines that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist, the court shall enter an order . . . [of] the issues of fact to be resolved and the manner in which the issues shall be resolved. To resolve the issues, the court may require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection"). *Cf. State v. Lott*, 779 N.E.2d at 1015 (when defendant raises *Atkins* claim in subsequent habeas petition, "the trial court shall decide whether petitioner is mentally retarded by using the preponderance of the evidence standard").

**42.** In his previously denied motion, applicant argued that "mental retardation is the kind of mental state question that Texas law has long required to be determined by a jury apart from the trial of the merits of the case." We disagreed. Mental retardation is not a transitory "mental state" like insanity or incompetency, which are temporary conditions that may excuse criminal conduct or postpone criminal proceedings. Applicant argued that because Texas statutes specifically provide for a jury trial issue on insanity and incompetency, he is therefore entitled to a jury trial determination of mental retardation in a post-conviction habeas corpus proceeding. First, there is no extant Texas statute which specifically provides for a jury determination of mental retardation in a criminal trial, so there is no current statutory right involved at any stage of the proceedings. Second, applicant failed to provide sufficient support for his argument that he is entitled to a jury determination of mental retardation in a post-conviction proceeding under article 11.071. He cited to a former Texas statute which had specifically provided for a jury determination of sanity if the question of sanity was first raised after conviction. *See Welch v. Beto*, 355 F.2d 1016, 1018 n. 2 (5th Cir.1966) (citing to former article 932b, the predecessor of article 46.02). That statute no longer exists and it would not apply to those who claim mental retardation under *Atkins* rather than insanity at the time of the commission of the crime or incompetence to be tried. Finally, he cited to a case from Oklahoma, in which the Oklahoma Court of Criminal Appeals determined that, even in post-conviction habeas corpus proceedings, a defendant who made a prima facie *Atkins* showing was entitled to a jury determination of mental retardation. *Lambert v. State*, 71 P.3d 30 (Okla.Crim.App. 2003). As applicant forthrightly admitted, the Oklahoma court did not explain why it would require the trial court to empanel a jury to determine mental retardation in a post-conviction proceeding. At any rate, in denying applicant's prior motion, we declined to follow *Lambert;* instead, we followed our own statutory procedures as enacted by the Texas Legislature.

**43.** Tex.Code Crim. Proc. art. 11.071, § 11 ("The court of criminal appeals shall expeditiously review all applications for a writ of habeas corpus submitted under this article. The court may set the cause for oral argument and may request further briefing of the issues

## C. The defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded.

■ By our count, twelve of the nineteen states with statutes prohibiting the execution of mentally retarded defendants place the burden of proof upon the defendant to show mental retardation by a preponderance of the evidence.[44] Similarly, House Bill 614, though not enacted by the 78th Texas Legislature, provided that the defendant must prove the issue of mental retardation by a preponderance of the evidence. The issue of mental retardation is similar to affirmative defenses such as insanity, incompetency to stand trial, or incompetency to be executed, for which the

Texas Legislature has allocated the burden of proof upon a defendant to establish by a preponderance of the evidence.[45] Therefore, we adopt that allocation of the burden and standard of proof, at least in the context of determining mental retardation in the habeas corpus setting where the inmate traditionally bears the burden of proof.[46]

■ Our review of a trial court's findings of fact and conclusions of law concerning a claim of mental retardation remains the same as it has always been on habeas corpus applications. We defer to the trial court's factual findings underlying his recommendation when they are supported by the record.[47] Thus, we afford almost total

---

by the applicant or the state. After reviewing the record, the court shall enter its judgment remanding the applicant to custody or ordering the applicant's release, as the law and facts may justify").

44. Our sister states that have set the burden of proof at a preponderance of the evidence are: Arkansas, Idaho, Illinois, Louisiana, Missouri, Nebraska, New Mexico, South Dakota, Tennessee, Utah, Virginia, and Washington. *See* ARK.CODE ANN. § 5–4–618 (Michie 2003); IDAHO CODE § 19–2515A (Michie 2003); 2003 Ill. Laws 093–0605; 2003 La. Acts 698; Mo. REV.STAT. § 565.030 (2003); NEB.REV.STAT. § 28–105.01 (2003); N.M. STAT. ANN. § 31–20A–2.1 (2003); S.D. CODIFIED LAWS § 23A–27A–26.3 (Michie 2003); TENN.CODE ANN. § 39–13–203 (2003); UTAH CODE ANN. § 77–15a–104 (2003); VA.CODE ANN. § 19.2–264.3:1.1 (2003); and WASH. REV.CODE § 10.95.030 (2003). Our sister states that have set the burden of proof at clear and convincing evidence are: Arizona, Colorado, Delaware, Florida, and Indiana. *See* ARIZ. REV.STAT. § 13–703.02 (2003); COLO.REV.STAT. § 18–1.3–1102 (2003); DEL.CODE ANN. tit. 11, § 4209 (2003); FLA. STAT. ANN. § 921.137 (West 2003); and IND.CODE § 35–36–9–4 (2003). Two of the nineteen (Kansas and Kentucky) do not have a statutory burden of proof. *See* KAN. STAT. ANN. § 21–4623 (2002) and KY.REV.STAT. ANN. § 532.135 (Michie 2002).

45. *See* TEX. PEN.CODE § 8.01(a) (insanity is an affirmative defense); TEX.CODE CRIM. PROC. art. 46.02(b) (a defendant is "competent to stand trial unless proved incompetent by a preponderance of the evidence"); *id.* at art. 46.05(k) (execution shall be stayed if trial court makes a finding by a preponderance of the evidence that the defendant is incompetent to be executed); *see also State v. Lott,* 779 N.E.2d at 1015 (holding that defendant "bears the burden of establishing that he is mentally retarded by a preponderance of the evidence").

46. *See Ex parte Peterson,* 117 S.W.3d 804, 818 & n. 60 (Tex.Crim.App.2003) (per curiam) (defendant bears burden of proving double jeopardy claim by preponderance of evidence on writ of habeas corpus); *Ex parte Kimes,* 872 S.W.2d 700, 703 (Tex.Crim.App.1993) (defendant-applicant bears the burden of proof at a habeas hearing to show a constitutional violation); *see also Ex parte Thomas,* 906 S.W.2d 22, 24 (Tex.Crim.App.1995) ("[t]he burden of proof in a writ of habeas corpus is on the applicant to prove by a preponderance of the evidence his factual allegations"); *Ex parte Adams,* 768 S.W.2d 281, 287–88 (Tex.Crim.App.1989).

47. *See Cook v. State,* 940 S.W.2d 623, 627 (Tex.Crim.App.1996) (noting that "[w]hile we are not bound by the findings of the habeas court, we generally accept them, absent an abuse of discretion").

deference to a trial judge's determination of the historical facts supported by the record, especially when those fact findings are based on an evaluation of credibility and demeanor.[48] However, if the trial court's ruling is not supported by the record, this Court may reject the findings.[49]

With the above substantive and procedural standards as a guide, we turn now to a review of the evidence offered at applicant's *Atkins* evidentiary hearing.

## III.

As this case amply demonstrates, determining what constitutes mental retardation in a particular case varies sharply depending upon who performs the analysis and the methodology used.[50] Here, for example, the primary defense expert's background is in the treatment of mental illness and mental retardation.[51] His overall position was that one had to look for the person's adaptive deficits and limitations, putting aside his positive adaptive skills. His focus is upon socially acceptable and successful skills. The State's expert's background is in statistical methodology and forensic diagnosis. His overall position was that one must look to the person's positive adaptive abilities and coping skills. His focus is upon whether the person has rational responses to external situations, not necessarily whether those responses are lawful or socially appropriate. The defense expert sees the glass half-empty, the State's expert sees the glass half-full. Both experts relied upon the same evidence and objective data to support their conclusions, yet the defense expert diagnosed mental retardation while the State's expert found no mental retardation but did find evidence consistent with antisocial personality disorder.[52]

---

48. *See Ex parte Martin*, 6 S.W.3d 524, 526 (Tex.Crim.App.1999).

49. *See Ex parte Adams*, 768 S.W.2d 281, 288 (Tex.Crim.App.1989) ("[i]f the record will not support the trial judge's conclusions, then this Court may make contrary findings").

50. *See, e.g., Webster v. United States*, 2003 WL 23109787, 2003 U.S.Dist. LEXIS 17383 *36–43 (N.D.Tex.2003) (setting out differing defense and government experts' analysis, use, and view of data in assessing question of mental retardation).

51. The defense sponsored two qualified expert witnesses, one of whom administered the WAIS–III IQ test to applicant and reviewed educational materials and prison records supplied by applicant's counsel. The other defense expert was primarily a psychotherapy counselor in mental health/mental retardation and an advocate for MHMR services. It was this second expert who provided more extensive testimony concerning applicant's adaptive behavior.

52. The DSM–IV criteria for Antisocial Personality Disorder are:
- failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;
- deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure;
- impulsivity or failure to plan ahead;
- irritability and aggressiveness, as indicated by repeated physical fights or assaults;
- reckless disregard for safety of self or others;
- consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations;
- lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

DSM–IV 649–50 (1994). Antisocial Personality Disorder is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the criteria. *Id.* For diagnostic purposes, the individual is at least 18 years, there is evidence of Conduct Disorder with onset before age 15 years, and the occurrence of antisocial behavior is not exclusively during the course of a Schizophrenic or Manic episode. *Id.* Because of the overlap of diagnostic criteria for both Mental Retardation and Antisocial Personality disorder, equally qualified experts may rationally reach

## A. Applicant did not prove, by a preponderance of the evidence, that he has significantly subaverage general intellectual functioning.

At the *Atkins* evidentiary hearing, applicant's counsel stated that there was not much dispute about applicant's IQ level. He had been tested in June, 2002, when he was 45, by applicant's expert and obtained a full-scale IQ score of 72. He was tested by the State's expert approximately one year later and obtained a full-scale IQ score of 74.[53] According to the DSM–IV, "significantly subaverage intellectual functioning" is defined as an IQ of about 70 or below.[54] Based upon these tests and the experts' interpretation of their significance, the trial court entered a factual finding that:

> [t]he preponderance of the evidence does not show that these test scores over-state the actual intellectual functioning of Applicant; the evidence in fact showed that there are good indications

that the test scores understated Applicant's intellectual functioning.

There is ample evidence in the record that supports this factual finding and thus we adopt the trial court's finding.

## B. Applicant did not prove, by a preponderance of the evidence, that he had significant limitations in adaptive functioning.

■ It is in the area of adaptive behavior that applicant's and the State's experts widely differed in their opinions concerning the same historical facts.

The evidence showed that, until the age of nine or ten, applicant was raised by his maternal great-grandmother. According to Diana Villarreal, applicant's cousin, his great-grandmother disciplined applicant by tying him to a bed frame and whipping him. She remembers that applicant's great-grandmother would say, "Ask him why," when Diana asked about the beatings, but applicant would never tell her.

---

contrary opinions based upon the same data. Compare DSM–IV 39–44 with *id.* 649–50.

**53.** There were references to several other IQ tests that applicant had taken as a child and these tests ranged from a low of 67 to a high of 88, but both applicant's and the State's experts agreed that the two recent tests most accurately and comprehensively reflected applicant's true IQ. The trial court found that "[t]he scores of the two tests thus give great confidence that the scores are reliable and accurate."

The experts disagreed about the significance of the 95% confidence interval and whether, given the two similar IQ test results over time, the standard "plus or minus 5 points" to accommodate the statistical "standard error of measurement," should apply. This statistical 95% confidence interval may not be an entirely appropriate measurement when the burden of proof is preponderance of the evidence, not a 95% confidence burden. There is not, however, enough information in this record to decide that question.

After the trial court entered its findings, applicant filed written objections, attaching

an unsworn letter from another expert. This letter asserts that the standard measurement of error applies regardless of the number of IQ tests taken or the similarity of scores obtained. This unsworn letter, however, was not timely submitted for the trial court's consideration and it is not a statement made under oath in open court, subject to cross-examination. It is hearsay. Therefore, we decline to consider it for the truth of the matters asserted. Tex.R. Evid. 801–802. But even if a factfinder applied the statistical standard deviation, there is not enough evidence in this record that proves, by a preponderance of evidence, that applicant's true IQ is lower than 72–74 rather than higher than 72–74. Thus, the trial court did not abuse its discretion in finding that applicant failed in his burden of proof even if it did "disregard" the standard error of measurement as applicant asserts.

**54.** American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 41 (Text Revision, 4th ed.2000).

As a result of this discipline, applicant would run away, often for days at a time.[55] To the defense experts, this was an example of a deficit in adaptive behavior because running away shows poor decision-making; a well-adapted person would seek assistance from another family member, teacher, friend, or social services provider. To the State's expert, this was an example of good survival skills,[56] and as one of the first symptoms noted in the DSM–IV of "conduct disorder," a precursor to "antisocial personality disorder."

Applicant attended East Elementary School in Carrizo Springs I.S.D. According to one of applicant's cousins, this was a school for "problem children" who disrupted the classroom, but his other cousin testified that it was a school for those who had fallen behind in their work because of illness, truancy, or migrant living.[57] Applicant's records showed that his early school work was entirely unsatisfactory, but that he improved somewhat and, after being retained in "pre-primer," was promoted to the next grade each year thereafter.[58] Both the defense and State experts agreed that applicant's school records reasonably reflected his academic functioning abilities.

At the age of thirteen, applicant went to Peoria, Illinois, to live with his mother;[59] however, from age fourteen to eighteen applicant was under the care of Illinois juvenile authorities because of repeated acts of delinquency, including five "runaway" violations, truancy, aggravated battery, and two burglaries.[60] According to Illinois juvenile authorities:

> Joe reports that his running away from home is not due to an unpleasant home or family life. Instead, he says he does so because it is sometimes fun to stay out all night and partly because of his dislike for school. Joe also mentioned that sometimes he does not know why he leaves home, "something just comes into my head, I run away. The next day I feel sorry." Joe admits that he has lied many times. He says he realizes that many times he has promised people that he would behave and then would break those promises. Joe feels his parents love and care about him. Both Mr. Briseno [applicant's step-father] and Joe

---

55. According to another cousin, applicant's great-grandmother was a very controlling person and her beatings were "what ruined him, that's what got him off to a pretty bad start."

56. The State's expert stated that applicant displayed "very adaptive behavior" by getting out of a difficult environment when his great-grandmother beat him. If he had stayed and simply accepted the beatings, that reaction would show less intelligence and less adaptive conduct.

57. It is significant that neither of these cousins testified that they thought, at the time they knew him, that applicant was mentally retarded or mentally slow.

58. Diana Villareal testified that applicant did go to school, but he would cut classes whenever he could, and he started hanging out with "the wrong type" of people.

59. According to Illinois records, applicant was sent to his mother in Illinois because he was then in a Texas juvenile facility charged with burglary.

60. Applicant told his Illinois juvenile probation officer that he had burglarized places "to obtain things that he and his family could not afford to buy." His stepfather told the officer that applicant associated with other delinquent boys and that he was easily influenced. To the defense expert, applicant's behavior of stealing or committing forgery to obtain food or other necessary items showed a lack of adaptive behavior because a person who lacks basic necessities should seek assistance from social services. To the State's expert, applicant's behavior showed that he knew what he wanted, could formulate a relatively sophisticated plan to obtain it, and could carry through on those plans.

feel that there has not been enough discipline given at home, yet Joe says his step-dad has a very bad temper and has on occasion beaten him. Police reports and school records mention that Joe has run away because of fear of such beatings.[61]

From this evidence, the defense experts saw "impulsivity," a trait associated with mental retardation.[62] On the other hand, the State's expert saw this impulsive behavior as consistent with conduct disorder.

According to Illinois juvenile records, applicant had "slithered" through the Tex-

as school system. He had a "high dull normal" or "low average" intelligence,[63] and, at first, functioned academically at about the fourth grade level. After four years in the juvenile facilities, he was issued an eighth grade diploma.[64] His behavior and work performance was "very positive," [65] although he did not express a desire to continue his education. He wanted to be a mechanic and "pump gas." [66] Both the defense and State experts pointed to the same juvenile records showing applicant's responses to a series of assessment questions as evidence of either poor, or good, reasoning ability.[67] It is highly

61. Other records indicated that applicant was frequently involved in fights although he stated that "he did not like to fight." One recorder opined: "It may be that he gains identity through his aggressive acts especially in light of his stepfather reportedly having a police record for stabbing four men in Chicago. [Applicant] does appear to have some admiration for his stepfather."

62. One defense expert testified that those with mental retardation are constantly running afoul of family members and law enforcement because of their lack of conceptual abstract abilities to think through what they are doing. Applicant's juvenile records stated:

Joe is impulsive. He doesn't or isn't able to discern the cause and effect relationship between himself and others, much less the consequences of this.

63. His Illinois probation officer stated that "Joe is felt to possess normal intelligence although there are no test scores to substantiate that."

64. Nonetheless, at age 17, an Illinois caseworker reported that applicant's achievement levels were: Word Meaning 4.4; Paragraph Meaning 3.4; Math Comprehension 3.9; Total Battery 3.9.

65. His juvenile pre-parole records state:

Joe's behavior in the classroom directly reflects his group life adjustment. His teachers report that he has proven to be mature, pleasant and amenable to suggestion. His performance in some subjects has been slow, due apparently to some uncertainty in

his ability, but indications are that once he gets started he does good work. His grades have been and remain above average.

Another report stated that he had no trouble following staff directions and he interacted well with other students, although he did have a tendency to "bully smaller, less sophisticated peers." He was "a fairly verbal" and "fairly sophisticated" youth who "found little trouble meeting his material and emotional needs."

66. Applicant points to TDCJ records of a truck driving course applicant took in prison as evidence that he is mentally retarded. These records showed that applicant had the ability to gain the knowledge and skill components to drive a truck, but that he was "just not suited for a truck driver. [H]e gets careless and ... tr[ies] too hard to correct mistakes." The defense expert explained that people with mental retardation "may be able to learn the individual intricate and isolated skills of a particular global behavior but not be able to put it all together in a functional way that works that people accept." The State's expert thought that applicant was just not a careful driver.

67. The juvenile assessment questions and applicant's answers were:

1) How are you going to avoid trouble on the street? (Be specific)
I am going to avoid trouble by stop doing the things I use to do like stop smoking not and stop drink and by staying away from the cops that how I am going to avoid trouble.

significant that in none of these voluminous records is there any indication from any source that any person thought applicant might be mentally retarded.

Applicant's records and self-reports show that he began drinking alcohol at the age of nine and started abusing other substances, including marijuana, glue, LSD, speed, and barbiturates before he was 18. Both the defense and State experts agreed that applicant's drug use may have impaired his brain functioning as well as his academic and social skills progress.

Once he was released from the Illinois juvenile system at the age of eighteen, applicant returned to Texas. By the time he was twenty-one, he had been sentenced to the Texas Department of Criminal Justice (TDCJ) for burglarizing a jewelry store with an accomplice and stealing $10,000 worth of rings, brooches and necklaces. Before this, he had been arrested for assault with a knife, a previous burglary of a building, and car theft. He returned to TDCJ shortly after he was re- leased on parole for burglary of a vehicle. After his second release from TDCJ, he was returned again on a forgery conviction, and then, when he "escaped" during a prison furlough, he committed aggravated assault and was sentenced to more time in prison. Applicant spent approximately ten out of the fifteen years between his release from Illinois juvenile authorities and the murder of Sheriff Murray in Texas prisons.[68]

To the defense experts, this criminal conduct was not inconsistent with mental retardation because these crimes "were not that hard," and they displayed an impulsivity and lack of successful life skills.[69] To the State's expert, this criminal conduct was consistent with antisocial personality disorder which is typified by problems with finding and keeping a job, with marriage, with law-abiding behavior, with lying, and by reckless disregard for the safety of others. He stated that applicant's impulsivity was antisocial behavior—striking out against other people.[70]

2) Honestly, what do you think you will do if your transfer is denied?
I will tried and keep on trieding till it gose through because this place is not the place for me. Why I say that because school included.
3) What do you think you should do to get paroled?
I should obey all the rules here and where ever I go and stay here if my transfer is denied.
To the defense expert, these responses reflect concrete and simplistic thinking; all of the answers were superficial and showed no insight into the questions asked. To the State's expert, these answers, although replete with spelling and grammatical errors, were appropriate and specific responses to each question. They showed an understanding of what the question was and provided a specific and "correct" answer designed to please the questioner.

68. According to the defense expert, this pattern of criminality showed that applicant was "not learning from experience ... opened the door for misbehavior again." According to the State's expert, this continued criminal conduct was consistent with antisocial personality disorder.

69. According to the defense expert, applicant realizes that he "has promised people that he would behave and then would break those promises.... [People with mental retardation] know they shouldn't do this, but they end up doing it anyway because of the characteristics of impulsivity."

70. According to the State's expert, "we have to look at historical records of the nature of the criminal offense, the person's ability to locate victims, to work in society, to use society to better his or her short-range impulsive needs." He acknowledged that there are mentally retarded persons who are criminals, but they tend to commit fairly primitive crimes, impulsive shoplifting, impulsive robbery, sudden acts of violence. Those who are mentally retarded will have a hard time finding victims, "pulling off a scam," finding and

Four TDCJ officers testified at the *Atkins* hearing that applicant's behavior seemed "normal" and "appropriate" in prison. He could understand them and they could understand him. They saw him reading magazines and filling out commissary forms appropriately.[71] The former Chief Deputy of Dimmit County testified that he had approximately ten different dealings with applicant and found him to be "intelligent, shrewd, and very cunning." This witness had interrogated applicant before and noted that:

> someone that's mentally retarded . . . it's hard to carry a conversation with them sometimes because they wander a lot. [Applicant] does not wander. He can keep a conversation going and he can stay in sequence.

Applicant testified briefly at the *Atkins* hearing and his testimony was clear, coherent and responsive. He denied doing some of the activities that the State's lay witnesses had said he did while he was awaiting trial on the capital murder charge twelve years earlier, such as using the local law library, cooking Mexican breakfasts for the prisoners, accompanying the jailer and keeping a written tally of the jailer's "prisoner count."

Based upon a lengthy recitation of the testimony at the evidentiary hearing, the trial court entered a factual finding that:

> The Applicant has not shown by a preponderance of the evidence that he has such "limitations in adaptive functioning" as would meet that prong of the

diagnostic criteria for mental retardation. The preponderance of the evidence showed that Applicant does not have significant limitations in adaptive functioning.

Because there is ample evidence in the record to support this factual finding and the trial court's credibility determinations, we adopt this finding.

In sum, we conclude that, while there is expert opinion testimony in this record that would support a finding of mental retardation, there is also ample evidence, including expert and lay opinion testimony, as well as written records, to support the trial court's finding that applicant failed to prove that he is mentally retarded. We defer to the trial court's credibility determinations, adopt the trial court's ultimate findings of fact, and, based on those findings and our independent review, we deny relief.

HOLCOMB, J., filed a dissenting opinion.

HOLCOMB, J., dissenting.

I dissent from the majority's opinion regarding both the resolution of this case and the judicial guidelines pronounced therein, particularly that the judge of the convicting court shall determine the factual merit of an *Atkins*[1] claim raised on habeas corpus. (Maj. op. Part II B). United States Supreme Court decisions and Texas legal tradition require a jury determination on the issue of mental retar-

---

hiding weapons, breaking out of jail, etc. "The more complex the crime, the less likely the person is mentally retarded." Thus, an examination of the type of criminal conduct and the circumstances involved in that conduct are relevant in determining whether a person is mentally retarded.

**71.** The defense expert noted that applicant had numerous prison disciplinary reports for

refusing to work and arriving late for a work detail. To him, this behavior was "consistent with deficits in adaptive skills around vocational and career areas." To the State's expert, this conduct showed that applicant was averse to working.

**1.** *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

dation if the applicant is able to make a *prima facie* showing sufficient to raise the issue. This Court found that applicant made a *prima facie* showing of mental retardation, but the trial court, not a jury, made the factual determination during the habeas proceeding. Thus, the procedure employed, though consistent with Texas Code of Criminal Procedure art. 11.071, § 9, was not sufficient to protect the applicant's constitutional rights.

I agree with the majority that this Court does not, under normal circumstances, create law. Our role is to interpret and apply the law as written by the Texas Legislature or as announced by the United States Supreme Court. Where such statutes do not provide procedures sufficient to protect an applicant's constitutional rights, we have an overriding duty to uphold the Constitution. Where constitutionally required procedures are not forbidden by statute, but are also not expressly permitted, the two are not necessarily in conflict.[2] In those situations, the courts must temporarily provide a remedy until the Legislature explicitly provides a constitutionally sufficient procedure.[3] Therefore, although

there is no authority in the Code of Criminal Procedure either for this Court to order the trial court to conduct a hearing before a jury on the issue of mental retardation in a habeas proceeding or for the trial court to hold such a hearing on its own accord,[4] we possess the authority, and the responsibility, to recognize the courts' ability to hold such a hearing if the Sixth and Eighth Amendments so require. I find that they do.

The Supreme Court has consistently recognized the uniqueness of the death penalty, and that Court requires a greater degree of reliability when the death sentence is imposed.[5] In *Furman*, Justice Stewart described the unique character of the death penalty:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.[6]

2. *See State v. Patrick*, 86 S.W.3d 592, 600–603 (Tex.Crim.App.2002) (Cochran, J., *dissenting*) (mandamus was inappropriate where action taken by trial court was neither permitted nor prohibited by statute and did not harm the interests of society, the State, or the orderly administration of justice).

3. *State v. McPherson*, 851 S.W.2d 846, 850 (Tex.Crim.App.1992) (trial court did not err in providing a judicially created fourth special issue in a death penalty case to comply with *Penry I* when the Constitution required an additional vehicle and neither the Supreme Court nor Texas Court of Criminal Appeals had provided guidance on the what vehicle to provide the jury.)

4. The Code of Criminal Procedure art. 11.071, § 9 states:
"If the convicting court determines that controverted, previously unresolved factual is-

sues material to the legality of the applicant's confinement exist, the court shall enter an order ... designating the issues of fact to be resolved and the manner in which the issues shall be resolved. To resolve the issues, the court may require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection." Tex.Code Crim. Proc. art. 11.071 § 9.

5. *See Strickland v. Washington*, 466 U.S. 668, 704, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

6. *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

This heightened need for reliability requires a procedure that allows for a jury determination of the facts in evidence, with the convicting court acting as a gatekeeper and not as the fact-finder.

While some courts have found that *Ring*[7] is not retroactive, at least one has found that it is.[8] I am likewise persuaded that *Ring* is retroactive.

Even if *Ring* is not retroactively applicable as to other issues, *Ring* and *Atkins* were decided in the same month, and *Atkins* most assuredly is retroactive. Although potential applicants' convictions may be final, they should be able to raise *Atkins* claims for the first time post-conviction. Of overriding importance regarding the issue of retroactivity under *Teague* is the finality of convictions.[9] Post-conviction *Atkins* claims do not allege error in the process used to obtain the convictions or sentences, so there is no issue of reviewing the correctness of procedures that did not follow procedural rules that had not yet been annunciated. What will be determined is if the applicant is eligible for the death penalty, under *Atkins*, and the process used to address this decision does not alter the fact that the issue must be addressed. Involving a jury to determine the *Atkins* claims does not threaten the finality of the final conviction any more than does having a trial court determine the *Atkins* claim without a jury. Because these claims are being addressed for the first time, there is no reason to proceed under rules as they were understood at the time the conviction became final. The applicant stands in the same position as defendants currently at trial and those on direct appeal whose *Atkins* claims are being heard for the first time. The process used to address these claims should be subject to the law as it stands influenced by *Ring*.

*Ring* is also applicable to the determination of mental retardation. Although a conviction for capital murder authorizes a maximum penalty of death in a formal sense, the defendant may not be sentenced to death unless certain findings are made. The Legislature has enumerated some of these findings in the statutory special issues, which have changed over time.[10] After *Atkins*, when the issue of mental retardation is raised, the defendant cannot be put to death—in effect is ineligible for the death penalty—if it is determined, through an as-of-yet undetermined process, that the defendant is mentally retarded. Surely the Sixth Amendment guarantee would apply to a factual determination that the Supreme Court held the Eighth Amendment required. In *Penry*, the Supreme Court reaffirmed the requirement that the jury be able to consider and give effect to all mitigating evidence.[11] While evidence of mental retardation could and can be considered as a mitigating factor in the jury's sentencing determination, such factors are discretionary. Determining whether the defendant is mentally retarded is not an exercise of the jury's discretion, but rather an act of fact finding. In this way, when raised by the defendant,

7. *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

8. *See Summerlin v. Stewart*, 341 F.3d 1082 (9th Cir.2003), *cert. granted, Schriro v. Summerlin*, —— U.S. ——, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003).

9. *See Taylor v. State*, 10 S.W.3d 673, 679 (Tex.Crim.App.2000), *citing Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

10. See Tex.Code Crim. Proc. arts. 37.071, 37.0711.

11. *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

the issue of mental retardation functions as an aggravating circumstance and not a mitigating circumstance.

Aside from the Federal Constitutional implications, the Texas Constitution [12] and Code of Criminal Procedure demonstrate a consistent public policy that juries should make factual determinations, especially in death penalty cases where the State does not even permit the defendant to waive the right to a jury trial.[13] Juries are employed in determining a defendant's mental illness as well as incompetency.[14] Although there is no statute setting forth the procedure for determining pre-trial or during trial whether a defendant is mentally retarded, it is unfathomable that juries will not be involved. Though no jury is required post-conviction to determine incompetency to be executed,[15] the question of **whether** a defendant may be executed requires heightened procedural safeguards that the question of **when** a defendant may be executed does not.[16] The Fifth Circuit also recognized this distinction when it upheld the constitutionality of the Texas statute providing a procedure to determine competency to be executed.[17]

Because many petitioners were convicted and sentenced to death before *Atkins*, they have not been afforded a jury determination of their claims of mental retardation. Even if such an applicant's trial strategy included presenting evidence of mental retardation during the punishment phase, the jury would have had discretion to determine whether the evidence warranted imposition of a sentence less than death. However, the jury would not have been instructed to determine whether the defendant was mentally retarded—the positive finding of which would disallow jury discretion regarding punishment based on the Supreme Court's decision. The Supreme Court found that there is a national consensus that execution of mentally retarded defendants constitutes cruel and unusual punishment. Unfortunately, national consensus does not necessarily translate to the consensus of a given jury. Because such applicants have the right to a jury determination on the issue of mental retardation, and the determination was not made at trial, it must be provided post-conviction in order to satisfy *Atkins* and *Ring*. Unless we determine that post-conviction *Atkins* claims fall outside the statutory habeas proceedings, we must incorporate the jury proceedings into our habeas corpus process and determine whether the applicant is entitled to relief in the form of commutation of his sentence from death to life in prison.

When the issue of mental retardation is raised post-conviction in a death penalty case, the Sixth and Eighth Amendments require that either the convicting court or the Court of Criminal Appeals review the evidence provided in the writ application to determine whether the evidence propounded by the applicant is sufficient to make a *prima facie* showing of mental retardation, and, if so, whether the evidence argued in the party's brief conclusively establishes that the applicant is mentally retarded. If

---

**12.** Tex. Const. art. I § 15.

**13.** Tex.Code Crim. Proc. arts. 1.12, 1.13.

**14.** Tex.Code Crim. Proc. art. 46.02 § 4.

**15.** Tex.Code Crim. Proc. art. 46.05(k). *See also, Ex parte Jordan,* 758 S.W.2d 250, 254 (Tex.Crim.App.1988) (pre-statute case determining habeas procedure sufficient, regarding competency to be executed, under *Ford v. Wainwright,* 477 U.S. 399, 425, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).).

**16.** *See Ford v. Wainwright,* 477 U.S. 399, 425, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

**17.** *Caldwell v. Johnson,* 226 F.3d 367, 373 (5th Cir.2000).

the court finds, based on the pleadings, that the applicant has conclusively proven mental retardation, the court may, without empaneling a jury, grant the relief to which applicant is entitled. The applicant would receive no greater relief from a jury determination. If the applicant has only established a *prima facie* case, the Sixth and Eighth Amendments require the convicting court to empanel a jury and hold a hearing for the limited purpose of resolving the factual issue of mental retardation. At that hearing, the applicant carries the burden of proof and the jury is required to come to a unanimous conclusion regarding whether the applicant has shown by preponderance of the evidence that he is mentally retarded. Depending on the jury's answer, the convicting court must then provide this Court with a recommendation to either deny relief on the applicant's allegation of mental retardation or commute the applicant's sentence to life.

Because I differ with the majority both on the resolution of this case and the judicial guidelines pronounced herein, I respectfully dissent.