JERRY E. SMITH, Circuit Judge,
dissenting:
I.
Largely for the reasons I expressed in dissenting from the opinion appointing counsel and staying execution, see In re Hearn, 376 F.3d 447, 459-71 (5th Cir.2004) (Smith, J., dissenting), I continue to disagree with the panel majority’s handling of this matter, which has been prolonged by misapplication of the standards set by Congress and the applicable caselaw.[1] This is a desperate attempt to salvage something from nothing, to manufacture an eleventh-hour claim of retardation to stave off execution. Every member of this panel (any protestations to the contrary) surely knows well that Hearn is not retarded, and the district court eventually will so find, yet this minuet is played again and again to satisfy fanciful notions of procedural nicety.[2]
In its most recent stanza, the song includes Hearn’s obvious inability to find an expert qualified under state law anywhere in the State of Texas who is willing to say that he is retarded. Two of the three “experts” he presents (after ample time and funds to find them) indeed appear to be qualified under Texas law, but both dechne to opine that Hearn is retarded. The panel majority evades this barrier by a bizarre parsing of state law and of state and federal caselaw, to find a way to allow Hearn’s third but unauthorized expert, Professor Patton, to testify.
II.
We are faced today with the same quan-dry discussed in In re Morris, 328 F.3d 739 (5th Cir.2003) (per curiam). There, in addressing another request to file a successive habeas corpus petition, this court discussed the conflicting evidence; one judge acknowledged that he was “confessedly dubitante” on whether there was “enough merit to warrant further explora *449 tion by the district court.” Id. at 741 (Higginbotham, J., concurring). To the extent we are “dubitante” here, we should follow the lead of the panel that issued binding Fifth Circuit authority in In re Johnson, 334 F.3d 403 (5th Cir.2003) (per curiam). In evaluating a request to file a successive habeas petition on an Atkins claim, the Johnson panel was faced with facts strikingly similar to those presented by Hearn. Much like Hearn, petitioner Johnson presented equivocal letters from a psychologist expressing the belief that his verbal intelligence level might be as low as 62-65. Johnson presented a seventh grade transcript showing failure in all his academic courses. The panel decided that “the two letters and seventh grade transcript offered by Johnson are simply insufficient to suggest that further development of his claim has any likelihood of success under the Atkins criteria.” Id.
III.
Hearn (and perhaps the panel majority) of course would counter that Hearn has presented the opinion of an “expert” who says he is retarded, and that that important evidence distinguishes this case from Johnson. But that could not possibly be so unless Hearn’s new affiant is qualified to speak to mental retardation under Texas law. It is at this point that the panel majority most seriously misses the mark.
A.
Hearn relies almost exclusively on the assessment of a witness, Professor Patton, who has an “Ed.D.” degree and who is self-described as “an educational consultant and author in the field of special education and disabilities” and has “served as a mental retardation specialist.”[3] One of the many problems with Hearn’s proffer, however, is that Texas law provides that mental retardation may only be “determined by a physician or psychologist licensed in this state or certified by” the Texas Department of Mental Health and Mental Retardation to make a determination of retardation. That is the specific requirement of section 591.003(16) of the Texas Health and Safety Code. It is undisputed that Patton is neither a physician nor a psychologist, in Texas or elsewhere.
B.
The panel majority’s excuse for considering Patton’s opinion is that “the Texas Health and Safety Code’s standard for those who may determine mental retardation ... has not been made applicable to Atkins proceedings.” This reasoning is so shabby as to seem contrived, though I am sure that, instead, it is presented in good faith.
Both parties in this case, and all three judges on this panel, agree that Texas has not yet formally adopted procedures for handling claims of mental retardation in the wake of Atkins. This vacuum has been dealt with successfully, however, by the Texas courts. Recently in In re Briseno, 135 S.W.3d 1 (Tex.Crim.App.2004), Texas’s highest criminal court recounted that in Atkins the Supreme Court “left to the individual states the substantive and procedural mechanisms to implement that decision.” Id. at 5. “The Texas Legislature has not yet enacted legislation to carry out the Atkins mandate.” Id. Accordingly, the Court of Criminal Appeals *450 recognized that it “must act to provide the bench and bar with temporary judicial guidelines in addressing Atkins claims.” Id. (footnote omitted).
The Court of Criminal Appeals then proceeded to “set out ... judicial standards for courts considering [Atkins] claims.” Id. It noted that the Texas Legislature had passed, but the governor had vetoed, legislation prohibiting execution of the mentally retarded that adopted the definition of mental retardation contained in § 591.003(13) of the Health and Safety Code. The Court of Criminal Appeals also observed that it previously had employed the definition from § 591.003(13). Id. (citing Ex parte Tennard, 960 S.W.2d 57, 60-61 (Tex.Crim.App.1997)). The court reasonably concluded that “[ujntil the Texas Legislature provides an alternate statutory definition of ‘mental retardation’ for use in capital sentencing, we will follow the [American Association on Mental Retardation] or section 591.003(13) criteria in addressing Atkins mental retardation claims.” Id. at 8. Only a few days ago, this court recognized that indeed in Brise-no the Court of Criminal Appeals has “adopted ... the Texas Health and Safety Code section 591.003(13) ... as an alternative standard for a petitioner to show his mental retardation.” Morris v. Dretke, 413 F.3d 484, 497 (5th Cir.2005).
C.
It follows logically that if the State of Texas, through its highest criminal court, has decided to use its statutory definition of “mental retardation” in Atkins proceedings, it would be a “no brainer” that the statutory definition of who is qualified to opine as to mental retardation would also apply. In fact, reaching a contrary conclusion is unreasonable: to assume that the legislature or Court of Criminal Appeals would apply the one provision but not the other.
An examination of the two subsections of section 591.003 reveals why this is so. Subsection (13), which the panel majority blesses in today’s missive, states that “ ‘Mental retardation’ means significantly subaverage general intellectual functioning that is concurrent -with deficits in adaptive behavior and originates during the development period.” Subsection (16) of the same statute, which the panel majority dismisses as not properly ensconced as a Texas Atkins standard, reads, almost identically, as follows: “ ‘Person with mental retardation’ means a person determined by a physician or psychologist licensed in this state or certified by the department to have subaverage general intellectual functioning with deficits in adaptive behavior.”
In fact, it is difficult to imagine how “mental retardation” under subsection (13) can be determined accurately without some sort of standard for how its various components (“subaverage general intelligence,” etc.) can be identified in a particular person. The legislature wisely added the requirement of physician or psychologist to ensure that the definition itself has meaning and is not subject to the “opinion” of any lay witness that a particular person appears “dumb” or “smart.” In this very real sense, the limitation on who can opine as to retardation is an integral part of the definition of the term.
It is our duty to determine, as best we can during this “legislative interregnum,” Briseno, 135 S.W.3d at 5, what the Court of Criminal Appeals would do with subsection 16. It is nonsensical to suggest that the legislature or Court of Criminal Appeals, if faced with the question, would utilize subsection 13 without subsection 16. Yet, that is precisely what the panel majority has done, using only the wimpy notion that subsection (16) “is not mentioned *451 in Briseno.” Of course, the obvious reason subsection (16) is not mentioned there is that it apparently was not an issue there, as it most certainly is here.
D.
Perhaps the most profound statement in the panel majority’s opinion is the following: “Nothing in Briseno supports the proposition that Dr. Patton is unqualified to opine whether Hearn is mentally retarded for purposes of an Atkins claim; indeed, Briseno relied upon lay opinion to determine retardation” (citing Briseno, 135 S.W.3d at 18). The lay opinion on which Briseno relied consisted of prison officers who testified that the prisoner’s “behavior seemed ‘normal’ and ‘appropriate’ in prison.” Id. A deputy sheriff testified that petitioner was “ ‘intelligent, shrewd, and very cunning.’ ” Id. These obviously were fact witnesses who testified as to their day-to-day encounters with the petitioner.
Hearn, on the other hand, proffers Patton as an “expert” in the field of mental retardation. The panel majority here is saying that even if Patton is unqualified under Texas law to testify as an expert, he can state his “opinions” as a lay witness. This runs directly contrary to Rule 701 of the Federal Rules of Evidence, which reads as follows:
If the witness is not testifying as an expert, the witness’ testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702.
(Emphasis added.)
If the panel majority’s statement holds true, the reasonable restrictions of rule 701 are entirely eviscerated. A petitioner (or, for that matter, the state) can present any “expert” to opine as to mental retardation, and if that person’s qualifications or testimony fails as a matter of law to constitute admissible expert testimony, his testimony nevertheless (and at the whim of any judge) can be received and considered as “lay” testimony.[4] This is indeed frightening.
rv.
A.
Fortunately, the panel majority has placed the following restriction on the use of Hearn’s witness’s report: The majority relies on it “for the limited purpose of assessing whether Hearn has made a pri-ma facie case of mental retardation—that *452 is, whether he has raised questions of possible merit which justify further exploration below.” By this statement, the district court is free to reject Patton’s testimony, including for the reason that he is not qualified in Texas to opine as to mental retardation under § 591.003(16), unless, of course, the district court buys into the astonishing notion (discussed in the preceding paragraph) that Patton can testify here as a lay witness.
B.
In this regard, I remind the district court that, on remand, it is fully authorized — indeed, charged with the responsibility — to serve as a “second ‘gate’ through which the petitioner must pass before the merits of his or her motion are heard.”[5] Thus, this court has “borrowed from the Seventh Circuit” the “ ‘tentative’ process” for considering an application for permission to file a successive habeas petition. In re Morris, 328 F.3d at 741 (Higginbotham, J., concurring).
Under this process, the district court is bound to use the following methodology: “[A] petitioner ‘must get through two gates before the merits of the motion can be considered.’ ” Reyes-Requena, 243 F.3d at 899 (quoting Bennett, 119 F.3d at 470). This is so because a court of appeals uses the prima facie test, making “rulings on such applications under tight deadlines and with limited information.” Id. (citing Bennett, 119 F.3d at 469). Stated another way, the duty of the district court is as follows:
Therefore, the “grant [by a court of appeals to file a second or successive motion] is, ... it is important to note, tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion.” [Bennett, 119 F.3d] at 470. The district court then is the second “gate” through which the petitioner must pass before the merits of his or her motion are heard.
... [T]he district court must conduct a “thorough” review to determine if the motion “conclusively” demonstrates that it does not meet AEDPA’s second or successive motion requirements [citation omitted].
Reyes-Requena, 243 F.3d at 899 (some brackets and ellipses in original).
V.
In summary, I dissent because the panel majority has failed properly to apply the AEDPA standard for determining whether a prima facie case has been made. In its otherwise flawed opinion issued almost a year ago, the panel majority accurately opined that the evidence Hearn had presented (which included an affidavit from Patton) was “certainly insufficient to establish a prima facie case of mental retardation.” In re Hearn, 376 F.3d 447, 455. In the intervening time, nothing of substance has been added to Hearn’s “certainly insufficient” proffer. If anything, his presentation has gone backward, for even with sufficient financial and temporal resources he has presented only the brief reports of two experts who are unable to say he is retarded, and the more detailed report of a third person who is unqualified as a matter of Texas law to opine on *453 Hearn’s mental abilities.[6]
Yet, the panel majority seems intent, once again, on extending this matter to yet another verse, to give Hearn “just one more chance” to establish mental retardation in the face of a showing that the majority admits is “slight.” I fully understand and respect the panel majority’s diligence in making sure there is no substance to Hearn’s new-found claim of disability. I only protest that even in light of that sensitivity, it is our duty, as keepers of the first “gate,” to call a halt and say “enough is enough” when faced with a claim that plainly fails to make a prima facie case under the requirements of AEDPA.[7] Accordingly, I respectfully dissent and place it into the hands of the district court to set this matter straight.

. See especially the summary of Hearn's flimsy evidence, summarized in part II.B.l and 2 of the dissent at 376 F.3d at 467-70 (Smith, J., dissenting).

. When I refer to "fanciful notions of procedural nicety,” I do not mean to make light of this matter, which is of the most serious nature given that a life hangs in the balance. Indeed, we must diligently follow the requirements laid, down by the Supreme Court and this court to assure Hearn his constitutional rights. But the panel majority, too, must remember that there are indeed death row inmates who are actually retarded and therefore not lawfully subject to the penalty of death, whose cases deserve our most serious attention. By expending excess resources— state and federal — on Hearn's frivolous claim, this court, albeit with the best intention, dis-serves those petitioners and muddies the standards that we must apply as the Supreme Court has directed.

. I do not mean in any way to criticize Professor Patton's work or to make fun of his credentials as a person with considerable experience (including writing and teaching) as an educational consultant and respected professor at a leading university. The question is whether he is qualified under Texas law to opine as to Hearn's claim of mental retardation. That is fair game, and no personal attack on Patton is intended.

. Despite the panel majority's undocumented theory, Patton does not qualify as a “lay witness,” either. His proffered testimony is based not on day-to-day, lay encounters with Hearn, but entirely on the following (as stated in his report):
I have reviewed the materials sent to me from Naomi Terr and Richard Burr, pertaining to their client, Yokamon Hearn. This information includes records of Mr. Hearn's academic, behavioral, personal background and the assessment results generated by Dr. Mary Alice Conroy from her evaluation conducted on 10 May 2005. I interviewed Mr. Hearn at the Polunsky Unit in Livingston, Texas, on 06 May, 2005. In addition, I interviewed his mother, five of his cousins, and a former teacher on 09-10 May 2005. Lastly, I conducted a formal adaptive behavior assessment with one of Mr. Hearn’s cousins on 15 May 2005. I performed all of these activities to determine whether or not Mr. Hearn met the criteria for mental retardation as indicated by the 2002 definition of the American Association on Mental Retardation.

. In re Morris, 328 F.3d at 741 (quoting Reyes-Requena v. United States, 243 F.3d 893, 899 (5th Cir.2001) (King, CJ.) (quoting Bennett v. United States, 119 F.3d 468, 470 (7th Cir.1997), and citing 28 U.S.C. § 2244(b)(4))).

. The special concurrence made a similar evaluation last year: “What little 'evidence' that has been presented is equivocal and needs explanation. If the record before us is all that Hearn can produce before the district court with the assistance of a lawyer, I would quickly agree that it falls far short of a prima facie showing.” In re Hearn, 376 F.3d at 458 (Higginbotham, J., concurring). No new admissible evidence that is substantial has been proffered.

. Predictably the panel majority might respond that it is the chore of the district court, and not this court, to do the final weighing in deciding whether a proper case is presented. We should follow the lead of the panel in Johnson, which, in deciding that no prima facie case had been established, carefully reviewed the petitioner's presentation and opined that it was "insufficient to suggest that further development of his claim has any likelihood of success under the Atkins criteria.” Johnson, 334 F.3d at 404.
In reviewing again what was written last year by the various members of this panel, I now question whether there was ever much attention to this court's role as the first gatekeeper. In other words, it may be that the panel majority always anticipated that leave would be granted to file a successive habeas petition so that the district court could evaluate the facts in the first instance. For example, the concurring judge reasoned as follows: “If there is nothing there, as the dissent seems to know, the district court will so conclude. In the end I have more confidence in facts decided by an Article III trial judge with competent counsel before him than those determined on appeal by appellate judges.” In re Hearn, 376 F.3d at 459 (Higginbotham, J., concurring). This approach flies in the face of Johnson and seems to suggest that this court’s role as the first gatekeeper is minimal, at best.