IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-37,658-03






EX PARTE JAMES LEE HENDERSON



 



ON APPLICATION FOR WRIT OF HABEAS CORPUS


CAUSE NO. 181CR1293 IN THE 102ND JUDICIAL DISTRICT COURT



OF RED RIVER COUNTY

 


 Cochran, J., filed a statement concurring in the denial of relief, in which Keller,
P.J., Price, and Johnson, JJ., joined.



CONCURRING STATEMENT


 In this subsequent writ application, filed pursuant to Article 11.071, § 5, of the Texas
Code of Criminal Procedure, applicant presents a claim of mental retardation under Atkins
v. Virginia. (1) After we remanded the application, the trial court conducted an evidentiary
hearing, and it considered significant documentary information, primarily prison records. 
The trial judge then signed findings of fact and conclusions of law and recommended that
relief be denied. We have reviewed the record, adopt all but one of the trial judge's findings
and conclusions, and deny relief. 

 Because this case presents a close question on the ultimate factual issue of mental
retardation, I add the following remarks.

 Applicant was convicted of the 1993 capital murder of an 85-year-old woman whose
home he had burglarized along with several friends. The State's evidence showed that
applicant shot the victim in the head as she was trying to call 911 from her bedroom,
"because she was looking at him like he had shit on him." One of his cohorts also shot the
elderly victim in the head. Both wounds were fatal. A jury answered the two special issues
affirmatively, and the trial court sentenced applicant to death. 

 Shortly before his scheduled execution date of June 10, 2004, applicant, for the first
time, (2) raised an issue concerning his limited mental capacity, claiming that he was mentally
retarded, and thus exempt from execution under Atkins. We stayed applicant's execution and
remanded his subsequent application to the trial court for an evidentiary hearing because
applicant had made a prima facie showing of mental retardation. 

 At the hearing, numerous witnesses testified, including one mental health expert for
applicant and two for the State. Dr. Susana Rosin testified for applicant that she is a licensed
psychologist who administered a Wechsler Adult Intelligence Scale III (WAIS-III) to
applicant in January, 2004, while he was on death row. He obtained a verbal score of 66, a
performance score of 73, and a full-scale score of 66. She also administered a Vineland
Adaptive Behavior Scales, and several other psychological tests. Dr. Rosin also reviewed
numerous trial records as well as applicant's juvenile and adult criminal history. It was her
opinion that applicant is mildly mentally retarded and that his 2004 I.Q. test of 66 is a valid
and reliable one. She acknowledged that a 1994 I.Q. test, done at the behest of applicant's
counsel before his capital murder trial, showed that he had a verbal I.Q. of 71, a performance
score of 89, and a full-score I.Q. of 77. (3) She did not think that the lower score in 2004
reflected any malingering on applicant's part. Rather, she concluded that 

 because there is no evidence of serious accidents, illnesses or head traumas
past the age of eighteen which would help account for a more recent drop in
[applicant's] I.Q. scores and that I.Q. scores tend to remain fairly consistent
throughout life, [applicant] has, in all medical and statistical probability,
functioned within the mildly mentally retarded range since birth or at least the
last time IQ scores can begin to be reliably measured (between the ages of four
and six). (4)


 Applicant also called three other witnesses who had known him as a child. One of
them taught applicant in the fifth grade. At that time applicant was in both regular classes
and a special education class. According to this witness, applicant was not "tidy," and did
not have good hygiene. He was well below his grade level for writing and a couple of years
below his peers in verbal skills. He did not turn in his homework, and sometimes "just didn't
come" to school. Applicant had low self-esteem and was gullible. He vandalized the
witness's school room one time by spraying the room with a fire extinguisher. Applicant's
school records were unavailable because his school burned down in the early 1990's and all
of the records were destroyed. It was this witness's opinion that applicant is mentally
retarded, although he has not seen applicant since he was in the seventh or eighth grade.

 A former Head Start kindergarten classmate of applicant's testified that applicant
came to school smelling like urine and wearing clothes that were too big. He was quiet, had
low self-esteem, and was gullible. This witness did not think that applicant had the ability
to perform academically, and he stated that applicant was held back a year at some point. He
thought applicant was "slow," but he did not have the opinion that applicant was mentally
retarded. A third witness testified that she was in the eighth grade with applicant and that
he would sometimes come to school smelling of urine. This witness knew that applicant's
mother had four or five other children, but that she did the best she could with them.

 The State offered some of applicant's prison records, including his commissary
request sheets, his inmate request reports, and an extensive number of intricate, handwritten
football "betting sheets" that had been found in applicant's cell. Applicant kept a meticulous
record of college and pro football games, the scores, his bets, and whether he had won or
lost. (5) His handwritten request reports were clear, concise, and grammatically correct, with
good spelling and a reasonably sophisticated vocabulary. He used such words as "resolve,
usually, grievances, warning, serious, manner, consequences, avoid." Applicant's
commissary requests were neat and spelled correctly; when he ordered several of the same
items, he could multiply the per unit cost by the number requested and obtain the correct total
cost. He sometimes ordered paperback and hardcover books and had Tom Clancy and
Steven King novels in his cell.

 His juvenile intake probation and parole officer testified that during the time she
supervised him, before he committed the capital murder, "he was not a follower. He was
always aware of what he was doing and why he did it." He wrote rational letters of
restitution to his crime victims. His problem, according to this witness, was that he couldn't
modify his behavior and did not follow rules. In her opinion, applicant was not mentally
retarded. 

 A Texas Ranger testified that he spent time interviewing applicant after the capital
murder. He responded coherently, rationally, and stayed on point. The Ranger never had any
reason to think applicant was mentally retarded.

 Steve Gilliland, a sociologist for the Texas Department of Criminal Justice (TDCJ), 
testified that he did an intake assessment of applicant when he arrived at death row in 1994. 
This assessment included giving applicant a short form of the WAIS-R. When applicant's
I.Q. tested at 83, Mr. Gilliland decided that more extensive mental retardation testing was
unnecessary. 

 Dr. Michael Gillhausen, a licensed psychologist and Mr. Gilliland's then-current
supervisor, testified that the reliability of the short form WAIS-R is 94% which is "very
acceptable." The reliability of applicant's 83 I.Q. score "would allow us to state that his I.Q.
would fall within the range from seventy-six to ninety, about ninety-five percent of the time,
so that's fairly close." He noted that Dr. Rosin had given applicant some achievement tests 
for which applicant scored at the seventh grade level when the mildly mentally retarded
usually cannot score above the sixth grade. 

 These discrepancies led Dr. Gillhausen to think that applicant might have been
motivated by "secondary gain" to do poorly on his 2004 post-Atkins I.Q. testing. Dr.
Gillhausen noted that when I.Q. test results vary widely, "the one that is most representative
of their intelligence is the highest one" because these are not like "true-false" tests where one
can "luck out." "You can't fake knowing the answer . . . [but] [i]f you do know the answer,
you could fake not knowing it."

 Dr. Gillhausen also stated that there are many reasons for putting someone in special
education classes as a child, including because one's achievement level is low in relation to
his I.Q., because he is mentally retarded or emotionally disturbed, or because of health
concerns or disruptive behavior. Dr. Gillhausen noted that applicant had a long history of
disruptive behavior. This expert said that he had "trouble" with someone's mental
retardation not being discovered until the age of 31. Dr. Gillhausen did not think applicant
was mentally retarded.

 The trial judge found, inter alia, that "[b]ased on Dr. Rosin's affidavit and in-court 
testimony . . . [her testimony] is less credible than the in-court testimony of Dr. Michael
Gillhausen and Mr. Steve Gilliland." He specifically found that Dr. Rosin's I.Q. test result
was based on a "test that she administered after [applicant] learned that establishing himself
as mentally retarded could save his life." The trial court also explicitly relied upon his
personal knowledge and recollection of applicant's in-court demeanor during both the trial
and habeas hearing.

 The Trial Court has had the benefit of extended observation of the demeanor
of [applicant] during extensive pre-trial hearings, jury selection, attorney-client
consultations, the trial and habeas corpus proceedings. Although the Trial
Court cannot articulate with expertise a definition and identification of mental
retardation, the court concludes that it can identify it when it sees it; the court
has not observed mental retardation in [applicant].


 Although there was evidence in this record indicating that applicant was mentally
retarded, there was also significant evidence showing that he was not. Either finding is
supportable by the record evidence. But as a reviewing court, only reading the record, we
must be especially deferential to the trial judge's factual findings, especially because he
presided over both the original trial and the habeas hearing. He was able to make credibility
and demeanor determinations of the witnesses and of applicant's courtroom actions and
demeanor that we are not capable of making on habeas review. See Ex parte Briseno, 135
S.W.3d 1, 12-13 (Tex. Crim. App. 2004) (in habeas context, "we afford almost total
deference to the trial judge's determination of the historical facts supported by the record,
especially when those fact findings are based on an evaluation of credibility and demeanor. 
However, if the trial court's ruling is not supported by the record, this Court may reject the
findings.") (footnote omitted).

 Based upon the evidence in this record, I agree that the trial court did not err in
concluding that applicant failed to prove, by a preponderance of the evidence, that he is
mentally retarded. Therefore, I join the Court in denying applicant relief on his mental
retardation claim.


Filed: January 25, 2006.

Do Not Publish
1. 536 U.S. 304 (2002).
2. I am unable to find any evidence that applicant's mental abilities or low I.Q. were ever
discussed or presented at his initial trial in 1994, although this trial was held more than four years
after the Supreme Court's decision in Penry v. Lynaugh, 492 U.S. 302 (1989), which would have
clearly put applicant on notice of the relevance of mental retardation evidence as a mitigating
factor.
3. The 1994 test was administered by a psychologist whose license had been revoked. He
used an out-of-date WAIS full/scale test rather than the appropriate WAIS-III test. This
psychologist concluded that applicant had an antisocial personality disorder of the parasitic type. 
He concluded that applicant's deficiencies were worsened because he had "no consistent parental
reinforcement." The psychologist stated that applicant's "way of getting by in the world is by
forming a dependent, ingratiating relationship to a stronger and more aggressive personality as in
a gang-related situation." (At trial, evidence was offered that applicant and several of his cohorts
were members of the "Crips" gang.) This psychologist stated that he found the following criteria
present before age fifteen: "[t]ruancy, delinquency, repeated casual sexual intercourse, substance
abuse, theft, poor school grades and probable lying."
4. However, Dr. Rosin also stated that she had not seen any I.Q. test for applicant before
the age of eighteen and that nothing in the available records showed that applicant did have an
I.Q. under 70 before the age of eighteen. 
5. It appears the applicant won more than he lost.