IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-38,355-03






EX PARTE DAVID LEE LEWIS, Applicant





ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM ANGELINA COUNTY






 Cochran, J., filed a statement concurring in the denial of relief, in
which Price and Hervey, JJ., joined.


STATEMENT 


 

 I join the Court's Order denying relief. The extensive trial and habeas record supports
the trial court's findings that Applicant failed to prove, by a preponderance of the evidence,
that he is mentally retarded. (1) I write separately to explain why I also join the Court in
declining to adopt the trial court's findings of fact eight and fifteen. 

 Findings eight and fifteen note that applicant's expert witness, Dr. Richard Garnett,
is not a physician or psychologist licensed in Texas. The two findings of fact that we reject
are:

 8. The Court finds, pursuant to Tex. Health & Safety Code § 591.003,
that a "person with mental retardation" means a person determined by
a physician or psychologist licensed in this state or certified by the
department to meet the stated definition of mental retardation.


 15. The Court finds, based on the 2006 writ evidentiary hearing, that Dr.
Richard Garnett is not licensed as a psychologist in the State of Texas,
but is a licensed professional counselor; that he is not licensed to
diagnose mental retardation; that he is not certified by the Texas
Department of Mental Health and Mental Retardation to make a
diagnosis of subaverage general intellectual functioning.


It is not that these two findings are inaccurate. Instead, they are not of legal significance in
deciding whether applicant is mentally retarded for purposes of eligibility for the death
penalty under Atkins v. Virginia (2) or Ex parte Briseno. (3) These facts may, of course, be
logically relevant in assessing Dr. Garnett's credibility and level of expertise, and the trial
judge could (and presumably did) (4) consider his testimony as logically relevant and then gave
it the weight he deemed appropriate. 

I.


 The trial court, in these two findings, refers to the definition of a "person with mental
retardation" that is contained in Chapter 591 of the Texas Health and Safety Code. (5) That
chapter is called the "Persons with Mental Retardation Act" ( PMRA). (6) The purpose of the
PMRA is to "provide and assure a continuum of quality services to meet the needs of all
persons with mental retardation in this state." (7) The PMRA reflects Texas public policy by
ensuring that those who are mentally retarded have the opportunity to develop their full
potential for becoming productive members of society (8) and to obtain assistance "in acquiring
and maintaining rights and in participating in community life as fully as possible." (9)

 This court has, as a temporary measure, (10) judicially adopted the definition of mental
retardation set out in section 591.003(13) of the PMRA as one possible definition for
purposes of an Atkins claim in the death penalty context. (11) In Briseno, we explicitly noted
that the PMRA has a very different purpose in the social services context than it does in death
penalty cases. (12) Thus, other definitions and provisions within the PMRA may or may not
have relevance to the issue of mental retardation under Atkins. In any event, they are not
determinative. This Court has never stated or suggested that only a person who is licensed
as a physician or psychologist in this state is competent to testify as an expert or to express
an opinion on whether a capital murder defendant is or is not mentally retarded. 

 The issue of whether Texas courts may consider the opinion of a witness who is not
a licensed physician or psychologist on the question of mental retardation under Atkins, has
apparently caused some confusion in the Fifth Circuit as noted in In re Hearn. (13) In that case,
the majority noted that, for purposes of the PMRA, mental retardation may be diagnosed only
by a physician or psychologist licensed in this state, but that this standard has not been made
applicable to Atkins proceedings in Texas state courts. (14) The dissent suggested otherwise. (15) 


 In Briseno, we explicitly noted that, in most cases, experts would probably be found
to testify on either side of the mental retardation question, at least on the adaptive behavior
prong. (16) Thus, we set out a number of other evidentiary factors that trial and reviewing
courts might consider in deciding the intrinsically fact-bound question of the adaptive
behavior prong of mental retardation. (17) Expert testimony, though helpful, is not essential. 
And, as I understand it, expert opinion testimony under Atkins or Briseno is not limited to one
who is a state-licensed physician or psychologist. A diagnosis for qualification of social
services under the PMRA is so limited, but an opinion for purposes of the Eighth
Amendment prohibition against cruel and unusual punishment is not so limited. In the death-penalty context, the fact-finder may give whatever weight and credibility it deems
appropriate to the opinions of either lay or expert witnesses. Licensure is not a litmus test
for the admissibility or consideration of any witness's testimony in this context.

II.
 

 The evidence at trial in this case showed that on November 30, 1986, applicant
entered the home of Mrs. Myrtle Ruby, a seventy-four year old widow, through an unlocked
bathroom window. He was armed with a loaded, sawed-off rifle. Mrs. Ruby came home
during the burglary, and applicant shot her in the face. He also struck her in the head with
the rifle and then drove off in her car with her shotgun, shells, and pillowcase. While
applicant went hunting with his grandfather, Mrs. Ruby died from the gunshot wound. 
Applicant was tied to the crime by physical evidence and by his admissions. After a trial in
April 1987, an Angelina County jury found applicant guilty of the capital murder of Mrs.
Ruby while in the course of burglarizing her home. (18) 

 At the punishment phase, the jury answered the special issues affirmatively and the
trial judge sentenced applicant to death. On direct appeal, we reversed and remanded for a
new trial. On retrial in June of 1993, applicant pleaded guilty to the offense of capital
murder, the second jury again answered the punishment issues affirmatively, and applicant
was again sentenced to death. This Court affirmed that sentence and, later, denied relief on
applicant's first writ.

 We remanded applicant's post-Atkins subsequent writ application to the trial court to
conduct a live evidentiary hearing because neither applicant nor the State had "an adequate
opportunity to develop all of the testimony, documentary materials, or other evidence
necessary to resolve applicant's claim." (19) The parties have now had a full and fair
opportunity to complete the record and present all available evidence on the question of
mental retardation.

 At the writ hearing, Dr. Garnett testified as the sole expert for applicant on his claim
of mental retardation. Dr. Garnett is a licensed professional counselor, with a license in
marriage, family therapy, and chemical dependency counseling. He is not licensed anywhere
as a psychologist, but he has done I.Q. testing, achievement testing, and some social testing
for school districts in North Texas for special education programs. He has done "workshops
for people who had mental retardation; wrote a manual on sex education for that population,"
but his Ph.D. dissertation was on biorhythms. 

 Dr. Garnett testified that he has done a variety of mental retardation assessments on
hundreds, if not thousands, of people over the past thirty years. He is a past president of the
Texas Association for Retarded Citizens and of the Texas Association on Mental
Retardation. The governor has appointed him to be chair of the Texas Council on Autism,
and he is on the board of the United States Association for Retarded Citizens and the Texas
Office of Prevention of Developmental Disabilities. He has testified as an expert in
approximately 25 civil or criminal cases to his "hands-on kind of knowledge about what
people with mental retardation are like[.]" However, Dr. Garnett has not done many
assessments in recent years and has not been trained in the new Wechsler Adult Intelligence
Scale. 

 After eliciting Dr. Garnett's qualifications, applicant's counsel offered him as an
expert in the area of mental retardation. The trial judge responded:

 Well, I never have agreed with a judge having to declare a person as an expert
or not. I'll allow him to testify, but I think it's my belief that that's for the
finder of fact, but he'll be allowed to testify.


The trial judge explained that "I never have declared anybody an expert. I'll allow him to
testify. . . . He will be allowed to offer his opinion, if that's your issue. . . . I'm not going to
declare the State's person an expert, I'll listen to their testimony. So proceed." 

 Dr. Garnett then explained that he had reviewed testimony from the first and second
trials, school records, a consultation report, records from TDCJ, police offense reports, and
affidavits. He had also listened to the testimony of applicant's other witnesses, and
personally interviewed applicant and other witnesses. Based on all of the information he
reviewed, it was Dr. Garnett's opinion that applicant has mental retardation. 

 Not surprisingly, the State's expert, Dr. Joseph Kartye, came to the opposite
conclusion based upon a review of the same material: applicant is not mentally retarded. Dr.
Kartye is a clinical psychologist licensed in the State of Texas, and his practice consists of
psychological testing, evaluation, and diagnosis. Dr. Kartye has testified for both the defense
and State in cases involving insanity, incompetence, and future dangerousness. Furthermore,
Dr. Kartye had testified at applicant's prior trial-before Atkins had been delivered and made
mental retardation a bar to imposition of the death penalty (20)-that applicant was not mentally
retarded. Instead, it was his opinion that applicant's test scores may not have reflected his
full intellectual functioning, possibly due to emotional or environmental factors that caused
a lack of motivation. (21) Dr. Kartye noted that applicant has obtained his GED while
incarcerated, and such an accomplishment would be an "outstanding feat" for a mildly
mentally retarded person. 

 The trial judge ultimately chose to place greater reliance upon Dr. Kartye's testimony,
as well as that of witnesses from the 1987 trial who testified that applicant was not mentally
retarded. The trial judge, who had also presided over the original trial and the punishment
retrial, was entitled to do so. I emphasize, however, that there is nothing in this writ record
that states or suggests that the trial judge rejected Dr. Garnett's opinions merely because he
was not a licensed physician or psychologist and hence unqualified to diagnose mental
retardation for purposes of the PMRA. Such an automatic rejection would be inappropriate
under Atkins and Briseno.

 III.


 In sum, I conclude that, while there is significant expert opinion testimony,
documentary materials, and lay testimony in this record that might support a finding of
mental retardation, there is also sufficient evidence, including expert and lay opinion
testimony, as well as written records, to support the trial court's finding that applicant failed
to prove that he is mentally retarded. In such a situation, I defer to the trial court's credibility
determinations and, except for numbers eight and fifteen, adopt its ultimate findings of fact. 
Based on those findings and my independent review, I agree with the Court's decision to
deny relief. 

 

Filed: December 6, 2006

Publish
1. See Ex parte Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004).
2. 536 U.S. 304 (2002).
3. 135 S.W.3d 1 (Tex. Crim. App. 2004).
4. The trial court's finding of fact number 14 states:

 The Court finds, based on the 2006 writ evidentiary hearing, [that the] trial court
did not designate Dr. Garnett as an expert but allowed Dr. Garnett to testify with
the admonition that the fact-finder, which is the trial court, would determine the
weight, if any, of his testimony.

We give great deference to this factual finding-dealing with the weight and credibility of the
testimony and with the level and scope of a witness's expertise. See Briseno, 135 S.W.3d at 9
("Although experts may offer insightful opinions on the question of whether a particular person
meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether
this person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive
punishment is one for the finder of fact, based upon all of the evidence and determinations of
credibility").
5. Section 591.003(16) reads: "'Person with mental retardation' means a person
determined by a physician or psychologist licensed in this state or certified by the department
[the Texas Department of Mental Health and Mental Retardation] to have subaverage general
intellectual functioning with deficits in adaptive behavior.'" Tex. Health & Safety Code §
591.003(16).
6. Id. § 591.001.
7. Id. § 591.002(b).
8. Id. § 591.002(a).
9. Id. § 591.002(e).
10. In Briseno, we explicitly stated, "This Court does not, under normal circumstances,
create law," but because the Texas Legislature had not yet enacted legislation to implement the
Atkins decision and to avoid delaying justice to inmates, victims, and society at large, we acted
"during this legislative interregnum to provide the bench and bar with temporary judicial
guidelines in addressing Atkins claims." 135 S.W.3d at 4-5.
11. Briseno, 135 S.W.3d at 8.
12. Id. at 6 (questioning whether "a consensus of Texas citizens agree that all persons who
might legitimately qualify for assistance under the social services definition of mental retardation
be exempt from an otherwise constitutional penalty").
13. 418 F.3d 444 (5
th Cir. 2005).
14. Id. at 446.
15. Id. at 450 (Smith, J., dissenting) (arguing that "if the State of Texas, through its highest
criminal court, has decided to use [the PMRA] statutory definition of 'mental retardation' in
Atkins proceedings, it would be a 'no brainer' that the statutory definition of who is qualified to
opine as to mental retardation would also apply").
16. 135 S.W.3d at 8 (noting that the "adaptive behavior criteria are exceedingly subjective,
and undoubtedly experts will be found to offer opinions on both sides of the issue in most
cases").
17. Id. at 8-9.
18. See Tex. Penal Code § 19.03(a)(2).
19. Ex parte Lewis, No. WR-38,355-03 (Tex. Crim. App. December 8, 2004) (not
designated for publication).
20. The trial judge, in his findings of fact, noted that "the testimony of Applicant's family
and friends may tend to be unreliable and biased in an Atkins hearing to determine mental
retardation." He also stated that in an "Atkins claim to determine mental retardation, such
information [by friends and family members] tends to be unpersuasive, tending to slant toward
deficiency because of a vested interest on the Applicant's behalf." We grant great deference to
these credibility and weight-of-the-evidence determinations by the trial judge who was present
and could assess the demeanor and credibility of the witnesses as they testified. Ex parte
Thompson, 153 S.W.3d 416, 417-18 (Tex. Crim. App. 2005).
21. Applicant's IQ was tested numerous times, but the results are not always clear. He was
given the WISC-R at the age of ten, but the results are unknown. At the age of eleven he was
retested with the WISC-R, but the record does not reflect numerical scores. His full-scale IQ
score and verbal scores were categorized as "mentally deficient," and his performance IQ was
categorized as "borderline." At age twelve, applicant took the Stanford-Binet, and the records
indicate that applicant scored in the "borderline" range of functioning. At age 16 he took the
WISC-R again and his full-scale IQ was in the "borderline" range, but his performance score of
86 was in the "low normal" range. At the age of 21, TDCJ records indicate an IQ test score of
85. The next year, shortly before his initial capital murder trial, he was given the WAIS-R test
and his full-scale IQ score was 74/75. Two years after that he was given the WAIS-R test again
and scored in the "low average" range. Various testers had noted that applicant did not always
seem to focus appropriately on the task at hand and his scores might have been affected by low
motivation and emotional factors.