IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







AP-75,037






Ex parte ELROY CHESTER, Applicant






Application for a Writ of Habeas Corpus


Case 76044 of the 252nd Judicial District Court of


Jefferson County






 Womack, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Johnson, Keasler, Hervey, Holcomb, and Cochran, JJ., joined.
Price, J., dissented.



 The applicant in this habeas corpus case is sentenced to death. Under Article 11.071 of the
Code of Criminal Procedure, he seeks relief from the sentence on the ground that he is mentally
retarded and it would be cruel and unusual punishment to put him to death. (1) The court in which he was
convicted has found the evidence insufficient to support the claim. Because the record supports that
finding, we deny relief.

Procedural History

 The applicant pleaded guilty to capital murder. Our law requires that a jury decide punishment
in a case in which death is a possible penalty. (2) At the punishment phase, the facts of the offense (which
we shall discuss below) were undisputed. After hearing evidence of the offense and other evidence
relevant to the punishment issues, the jury returned findings that required the trial court to enter a
sentence of death. (3) On the appeal that followed, (4) we affirmed the judgment and sentence. (5) We denied
habeas corpus relief on Chester's first petition. (6)

 This second petition is permitted because the Supreme Court's decision applying the Cruel and
Unusual Punishments Clause to a death sentence against a mentally retarded person (7) had not been
delivered when Chester filed his first petition.

 The convicting court held an evidentiary hearing on the petition. It received evidence that
included expert testimony on the issue of mental retardation, the results of various Intelligence Quotient
(IQ) tests, and evidence as to the applicant's adaptive behavior functioning. After considering the
evidence presented, the trial court entered findings of fact and conclusions of law, ultimately ruling that
the applicant had failed to meet his burden to prove his mental retardation by a preponderance of the
evidence.

The Briseno Factors

 The applicant now claims that the trial court used an improper standard in finding that he was
not mentally retarded.

 In another case on a claim for habeas relief on such a ground, Ex parte Briseno, (8) we decided
that courts should use the definitions of mental retardation as stated by the American Association of
Mental Retardation (AAMR), (9) and in the Health and Safety Code, (10) and we suggested a series of
questions to help fact-finders determine whether applicants have "deficits in adaptive behavior." (11)

 Essentially, this results in a three-part test to determine whether an applicant suffers from mental
retardation such that Atkins relief is warranted. First, whether the applicant has significant limitations in
intellectual functioning, which typically appears in the form of low IQ scores. Second, whether these
limitations were accompanied by significant deficits in adaptive functioning, usually expressed by limited
conceptual, social, and practical skills. Third, whether these limitations occurred and were recognized
before the age of eighteen.

 The applicant bears the burden to prove these factors by a preponderance of the evidence, in
order to show that he or she is mentally retarded. (12) As in all habeas corpus applications, the trial court
makes findings of fact and conclusions of law concerning a claim of mental retardation. We will accord
almost total deference to those factual findings, as long as they are supported by the record, and
particularly when they are based on an evaluation of credibility and demeanor. (13) If the trial court's ruling
is not supported by the record, however, we may reject those findings. (14)

 In the case at hand, there is no dispute as to the third part of the test, that the evidence in favor
of a finding of mental retardation occurred and was recorded before the applicant reached the age of
eighteen. The applicant's objections to the trial court's findings concern only the first and second
factors. We shall address them in turn.

 As to the first factor - the applicant's low IQ scores - there does seem to be a legitimate
dispute with the findings entered by the fact-finding habeas court. In the "Findings of Fact" submitted by
the trial court, the applicant's IQ test results were listed as follows:


 Wechsler Intelligence Scale for Children (WISC-R) administered by the Port Arthur
Independent School District (PAISD) in March 1977, when applicant was seven years
old:
 
 Verbal Score: 77
 Performance Score: 69
 Full Scale Score: 69
 


 


 WISC-R administered by the PAISD in March 1982, when applicant was twelve years
old:
 
 Verbal Score: 64
 Performance Score: 63
 Full Scale Score: 69
 


 


 WISC-R administered by the PAISD in February 1983, when applicant was thirteen
years old:
 
 Verbal Score: 70
 Performance Score: 87
 Full Scale Score: 77
 


 


 Wechsler Adult Intelligence Scale (WAIS) administered by the Texas Department of
Corrections in 1987, when the applicant was eighteen years old:
 
 Verbal Score: 70
 Performance Score: 69
 Full Scale Score: 69

 


 The trial court found a number of problems and concerns with the IQ evidence presented. First,
the trial court noted that there was conflicting testimony regarding the validity of the applicant's IQ test
scores, particularly regarding the large discrepancy between the results of the 1982 and 1983 tests. The
trial court eventually concluded that this testimony rendered the 1982 and 1983 test results inconclusive
as to the applicant's actual intellectual functioning at the time. The trial court also took issue with the fact
that the first three tests were all WISC-R tests, which are no longer in use and have now been replaced
by the WISC-III test, which has never been administered to the applicant. The court noted that the
WISC-III test was designed to counter criticisms of cultural bias within the WISC-R test, and that
using the WISC-R test would not adequately account for cultural, regional, or other types of factors
that may have influenced the applicant's test results. Finally, the trial court noted that the Texas
education system requires that, in order for a student to be classified as mentally retarded, his or her
test results must be below 70 for both verbal and performance scores, not only the full scale score.
Taking all of these concerns into account, the trial court concluded that the applicant had failed to
persuade the court that his intellectual functioning supported a finding of mental retardation.

 Our review of the record, however, shows that the applicant's test scores were misstated in the
trial court's findings, specifically in two places. First, in the first test, the findings report the applicant's
performance score as a 69, when in fact the record shows he scored a 65 (the full scale performance
score was still correct). Secondly, in the second test, the findings show the applicant with a full scale
score of 69, when the record shows he actually received a full scale score of 59 on his second test.
Given that the trial court's findings on the applicant's test scores were in conflict with the record, we
now reject the court's findings on this issue, and substitute the correct scores as noted here.

 With the scores as corrected, the record shows the applicant had his intelligence tested four
times in his first eighteen years of life. On three of those occasions, the applicant was assessed a full
scale score below 70, including a score of 59 when he was twelve years old. The only time he was
scored above a 70 was in 1983, when he scored a 77. There was testimony by the applicant's expert
witness that, in his opinion, this score was invalid due to the fact that the test was administered only
eleven months after the previous test, thus increasing the likelihood of "practice effects" in its administration.

 Although there is no clear number which experts agree will in every case mark the border
between what is or is not "significantly subaverage intellectual functioning" as stated in the AAMR's
definition of mental retardation, a full scale score of 70 is generally regarded as the benchmark from
which a diagnosis of at least mild mental retardation may be made. (15) Regardless of his higher 1983
score, we find the applicant's evidence of subaverage intellectual functioning persuasive. The applicant's scores were otherwise consistent with a diagnosis of at least mild mental retardation. We note in
particular the fact that the State's expert witness acknowledged on cross-examination that, despite his
reluctance to classify the applicant as mentally retarded, a person with similar IQ scores (as well as the
adaptive functioning score, discussed below) would properly be diagnosed as mildly mental retarded.
The applicant has met his burden in regard to demonstrating significant limitations in intellectual
functioning.

 That leaves us with the second factor - adaptive functioning - which, due to its inherently
subjective nature, is consistently the most problematic issue for factfinders to resolve when dealing with
these types of claims. (16) In Briseno, we acknowledged this difficulty and offered seven evidentiary
factors to assist factfinders in weighing evidence tending to support or refute a finding of adaptive
behavior deficits when evaluating mental retardation claims. (17) As we made clear, however, these factors
were intended only to be guidelines for trial courts to work with until the Legislature was to reconvene
and establish conclusively both the substantive laws and the procedures that would bring our codes into
compliance with the mandate issued by Atkins. Yet to this day, no such guidance has been provided by
the Legislature. Thus, the temporary suggestions we offered in Briseno remain today the only judicial
standards governing this unique type of claim under Article 11.071. (18)

 The applicant in his brief criticizes the Briseno factors as inadequate for the purpose of
accurately evaluating the adaptive behavior deficits of any given applicant. He points specifically to the
Vineland Adaptive Behavior Survey as a more reliable alternative. The applicant was administered the
Vineland test in October 1987 upon entering the Mentally Retarded Offender Program (MROP) of the
Texas Department of Criminal Justice, and he received a score of 57. As noted above, even the State's
expert witness at the hearing acknowledged that a person with a Vineland score of 57, combined with
an IQ of 69 as measured at the same time, would be correctly diagnosed as mildly mentally retarded.

 Persuasive as that may be, we cannot substitute our own judgment for that of the factfinder, so
long as the findings are supported by the trial record.

The Applicant Has Not Shown Significant Deficits in Adaptive Behavior

 The trial court's findings addressed all seven evidentiary factors listed in Briseno, and noted
carefully how the applicant had failed to persuade the trial court on each one. For example, in response
to the first Briseno question ("Did those who knew the person best during the developmental stage -
his family, friends, teachers, employers, authorities - think he was mentally retarded at that time, and, if
so, act in accordance with that determination?"), the trial court found that the applicant had been
classified during his school years as "learning disabled," rather than as mentally retarded. Conflicting
testimony was presented regarding the flexible and often confusing standards under which such
classifications were made in the Port Arthur Independent School District. Nevertheless, the trial court
considered and found more credible the testimony of Vicki Pitman, a diagnostician and witness for the
State. Pitman testified that the applicant's school records labeling him as learning disabled were
accurate, and that having a learning disability is not the same thing as being mentally retarded. The trial
court likewise was unpersuaded by the applicant's witness Elizabeth Segler, who was the applicant's
teacher and who said that, in her opinion, the applicant was moderately retarded. The trial court found
Segler's testimony to be contradictory, in that she also testified that the applicant was "certainly"
capable of learning if given proper teaching methods, which is also consistent with having a learning
disability.

 The trial court made similar findings in regards to the planned, rather than impulsive, nature of
the applicant's conduct as shown by the facts of the case itself, as well as to the fact that in all of his
crimes he acted independently of others instead of being led around. The court found no evidence in
either the trial record or the hearing to establish that the applicant's conduct in response to external
stimuli was irrational or inappropriate, regardless of its social acceptability.

 As to whether the applicant responded coherently and rationally to oral or written questions,
the trial court considered the testimony of both parties' experts regarding an evaluation of the applicant
conducted by Dr. Ed Gripon, the State's expert. The court was more persuaded by Dr. Gripon's
testimony that the applicant was able to converse with him coherently on a wide variety of topics,
including current politics, the concept of parole violations, and many specific facts of the crimes to
which the applicant had confessed. The trial court also noted the discrepancy in credentials between the
two experts, particularly that, while Dr. Gripon had been practicing in the field of psychiatry for thirty-two years and had testified in Texas courts on issues of mental retardation numerous times, the
applicant's expert had been licensed for six years, in which time he had held a total of seven jobs, none
for longer than two years. The trial court found the State's expert's testimony to be more credible.

 The trial court also found that the applicant was capable of hiding facts and lying to protect his
own interests, as demonstrated by the episode in which he told the investigators that he would take
them to where he had hidden his gun, all the while apparently planning to get to the gun himself before
the investigators could. Finally, the court found that the specifics of the various crimes to which the
applicant confessed, including the use of masks and gloves, his practice of cutting exterior phone lines
before entering homes to burglarize, and his deliberate targeting of victims like Cheryl DeLeon and his
brother-in-law Albert Bolden, showed persuasively that the applicant was capable of forethought,
planning, and complex execution of purpose.The Facts On the night of February 6, 1998, Erin DeLeon, age seventeen at the time, was home alone
with her one-year-old son Tony. Erin and Tony lived in the home of Erin's mother, Kim Ryman
DeLeon, along with Erin's sisters Claire and Sasha. After putting Tony to bed, Erin spoke briefly on the
phone with her boyfriend, and then began watching a movie in the living room. 

 Unbeknownst to Erin, the applicant was outside the house, watching her. He had been walking
through her neighborhood, searching for a place to burglarize. He had with him a pair of gloves, a
knitted hat in which he had cut two holes to make a ski mask, and a gun which he had stolen in a
previous burglary. He had scratched the serial numbers off of the gun. Upon reaching the Ryman home,
he recognized it as one he had burglarized previously. He watched Erin through the open window blinds
and, when it appeared that she was home alone, he went around the side of the house and cut the
phone lines, which he later said was his normal practice when committing a burglary. He checked the
side door to the house and found it unlocked. The applicant put on his mask and gloves, and entered
the house through the side door. That door opened into the kitchen, which he entered, and then came
into the living room where Erin was. 

 The applicant grabbed Erin by the hair, held the gun to her head, and demanded money or
jewelry. Erin replied that they had a little jewelry, but no money, in the house. The applicant then took
her through the house, still holding her by the hair, searching her mother's and sisters' bedrooms to
confirm that no one else was at home. He asked Erin where her mother was and if she was coming
home. Erin said her mother would be home in the morning. He then asked Erin who she had been on
the phone with earlier. Erin replied that she had spoken with her boyfriend.

 The applicant then took Erin into her mother's bedroom, from which he took some jewelry. He
then did the same in her sisters' and in Erin's own bedroom. He took her to the dining room, and then
had her turn off all remaining lights in the home. He then took her into the garage, still pulling her by her
hair.

 Once in the garage, Erin offered to turn on the lights but the applicant refused. Instead, he
began feeling around in the dark until he found a roll of duct tape. Erin later testified that she believed by
the way he was feeling around that the applicant knew exactly what he was looking for in the dark
garage. 

 As they re-entered the house, Erin's sister Claire was arriving at the side door with her
boyfriend Tim. They attempted to enter through the side door but the applicant had made Erin lock it,
so Claire knocked on the door. The applicant pulled Erin by her hair toward the door and, while hiding
behind her with his gun pointed at her head, ordered Erin to unlock the door and let her sister into the
house. When Claire entered the house, the applicant pushed Erin forward and yelled at Claire to not
say anything or he would "blow her [Erin's] head off." Claire began to babble incoherently and Erin
tried to quiet her. 

 Tim, still unaware of what was happening, was still outside on the porch and asked Claire what
was wrong. The applicant ordered Claire to tell Tim that nothing was wrong and that he should leave.
Claire complied, but Tim persisted, and the applicant then told him directly to come into the house.
Tim's car was still running, so he asked the applicant if he could turn it off first, and the applicant said
yes, but if Tim attempted to leave that he would kill both girls. Tim went to turn off his car ignition, and
then entered the house.

 Once inside, the applicant, still holding Erin by her ponytail and with the gun pointed at her
head, demanded jewelry or money from Claire and Tim. They said they had none - Tim showed the
applicant his empty wallet, and Claire went to her mother's bedroom to confirm that there was no more
jewelry in the house. When Claire returned, the applicant asked Tim what kind of car he had, and
specifically whether it was an automatic or a stick shift. Erin later testified that she presumed from those
questions that the applicant was thinking of using Tim's car to escape. The applicant then ordered
Claire and Tim into the bathroom.

 Alone with Erin in the dining room, the applicant ordered her to remove her clothes. Erin began
to do so. The applicant tried to remove her bra himself, and did remove her underwear himself. Erin
was now kneeling and wearing only her socks, and the applicant used the duct tape to blindfold her.
The applicant then called for Tim to come out of the bathroom. The applicant ordered Tim to strip, and
Tim removed all of his clothes except for his underwear and socks. The applicant then used the duct
tape to blindfold Tim, and to bind his wrists and ankles. After that, the applicant dragged Tim into
Erin's bedroom. 

 The applicant returned to the dining room and ordered Claire to come out of the bathroom. He
ordered Claire to remove her clothes, and she complied. The applicant then blindfolded Claire with the
duct tape, and seated her on the floor next to Erin. Erin then removed the tape over her eyes enough to
see the applicant unzipping his pants and removing his mask, but the applicant came over to push the
tape back down over her eyes.

 The applicant then raped Erin vaginally, on the floor, next to her sister. When he was done and
had removed himself from on top of her, Erin tried to get up, but the applicant pulled her over to where
he was now sitting in a chair, and forced her to perform oral sex on him. The applicant kept the gun
next to Erin's forehead and threatened to shoot her if she tried to bite him. After the oral sex, Erin
moved to the floor area at one side of the room, and the applicant ordered Claire to perform oral sex
on him, which she did. The applicant repeated the same threat that he would shoot her if she bit him. 

 At this point, a car approached the house. The applicant heard the car, ran into the kitchen to
dress himself, and then went to stand by the side door to wait for the person approaching, who turned
out to be Willie ("Billy") Ryman, Kim Ryman's brother and the girls' uncle. Billy would often come to
the house to check on the girls, when he knew their mother was at work. Billy opened the door and
turned on the light. The applicant yelled at him to come inside and, upon entering, the applicant shot
him. Billy fell to the ground immediately, and the applicant dragged his body into the kitchen, where
Billy eventually died. The applicant then ran out of the house. Claire got up and locked the side door,
locking the applicant out of the house.

 Billy's girlfriend Marcia Sharp had been waiting outside in Billy's truck in the driveway while he
went up to the house. Marcia heard the gunshot fired at Billy but thought perhaps it was a car
backfiring. Moments later, she saw the applicant run out of the house and then try to go back in, after
realizing he had been locked out by Claire. The applicant then approached the truck on the passenger
side, where Marcia was sitting. The door was unlocked but, just as the applicant reached for the
handle, Marcia locked it. The applicant was now wearing his mask again. The applicant pulled out his
gun and shot once at the lock on the car door. He then noticed that the driver's door was unlocked, so
he ran around to the driver's side of the truck, but Marcia quickly reached over and locked that door,
too. The applicant shot twice at the lock on the driver's door, but it did not open. He then stepped
back, looked at Marcia, and shot twice more at the driver's door window. None of the gunshots hit
Marcia. The applicant then ran down the street, away from the house.

 The events at the Ryman Deleon home were the culmination of a six-month spree of criminal
activity by the applicant, in which he burglarized at least five residences, sexually assaulted two people,
murdered at least five people, and fired shots at no fewer than five others. Among the crimes that the
applicant eventually confessed to committing during this period were the following: 


 The burglary and homicide of John Henry Sepeda. Like the case at hand, the
applicant used wire cutters to cut the phone lines to Sepeda's home before entering it,
he wore a mask which he had brought with him, and he carried a gun. He also carried a
flashlight. The applicant entered the bedroom where Sepeda and his wife were sleeping, and began to burglarize the room while they slept. Sepeda woke up, and approached the applicant, who shot and killed him. Before fleeing, he demanded that
Sepeda's wife give him a ring that she was wearing.




 The murder of Albert Bolden, the applicant's common-law brother-in-law. He gave
two reasons to the police for his motive: Bolden had been beating his sister, and/or
Bolden had set him up on a date with a woman who turned out to be a transvestite. The
applicant invited Bolden to commit a burglary with him, and brought him to a vacant
home he knew of in Port Arthur. In fact, the applicant had no intention of burglarizing
the home and instead admitted that he just wanted to kill Bolden. After leading Bolden
to the vacant home, the applicant directed him to walk through the door first, and then
shot him in the back of the head. The applicant then fled the scene and hid the gun that
he used.




 The burglary and homicide of Etta Stallings. Again, the applicant wore a ski mask,
carried a gun and a flashlight, staked out the home beforehand to see who was there,
and cut the phone lines outside before breaking into the home. As in the Sepeda case,
he attempted to burglarize the home while Stallings and her husband were asleep, but
Stallings woke up. She pulled a gun out of her dresser drawer, and the applicant shot
her, killing her. The applicant then took the property he had stolen, as well as Stallings'
gun, and stashed it all under a nearby vacant house. 




 The murder of Cheryl DeLeon. The applicant knew DeLeon because they had
worked together at a local Luby's restaurant for eleven months in or around 1992. He
admitted he would often sexually harass her, and she would complain about it to their
boss. Knowing that she still worked at Luby's, the applicant likewise knew that she got
off work at 8:00 in the evening. After it had gotten dark outside, the applicant went to
DeLeon's home. As in the case at hand, he was wearing a mask, carrying a gun, and
wearing gloves. This time, he unscrewed the lightbulb illuminating a storage shed near
the back door of her house, so that he could lay in wait under cover of darkness. He
laid down on the ground by the storage shed, and waited thirty to forty-five minutes in
the dark until DeLeon's car pulled into the driveway. As DeLeon got out of her car and
walked to her back door, the applicant ran up and grabbed her. They struggled, she
screamed, and he hit her in the side of the head with the gun. According to the applicant, the gun went off accidentally when he hit her with it, shooting her dead. The
applicant then fled to his father's home, where he hid the gun in the attic.



 The Port Arthur police arrested him. While in custody, and after being asked to provide a
blood sample, the applicant told investigator Timothy Smith that he would take him to where the gun
that was used in the crime was located. The applicant knew Smith and seemed to trust him more than
he did the other officers. Smith, two other investigators from the District Attorney's office, and two
local detectives then accompanied the applicant to his father's house. The applicant was wearing a jail
jumpsuit, as well as leg restraints attached by a chain to another chain around his waist, which in turn
connected to a pair of handcuffs, thereby shackling his wrists to his waist, such that his mobility was
extremely limited. 

 Upon reaching his father's house, the applicant attempted to move ahead of the others. Smith
had admonished the applicant that he would not be allowed to handle or touch the gun himself, but the
applicant insisted that he would have to locate the gun personally because it was in a place that was
difficult to reach. The applicant assured Smith that the gun was unloaded, and that he himself was the
only one who would be able to reach it.

 The applicant led the others to his bedroom and, despite efforts to prevent him from moving
ahead too quickly, walked over near his bed and dragged a small nightstand to a position directly
underneath a hole in the ceiling. The applicant began to climb on top of the nightstand, but was quickly
told to stop. One of the investigators, Rose, then climbed on top of the nightstand to look in the hole,
and the applicant directed him to look in a specific direction for the gun. Rose looked and reached
around inside the hole as directed by the applicant, but could not find the gun. The applicant then
climbed atop the same nightstand where Rose was standing and, while continuing to direct Rose to look
in the same direction he had previously indicated, attempted to reach with his shackled hands in the
opposite direction from where he had told Rose to look.

 Smith had been watching the applicant the entire time and, when he saw the applicant reach
with his hands in the other direction, drew his gun and ordered the applicant to stop moving. The
applicant was taken down from the nightstand and escorted to sit on a nearby couch. Smith then
climbed atop the nightstand himself and looked in the direction where the applicant had attempted to
reach. He immediately saw the gun and retrieved it. The gun was fully loaded.

Conclusion

 The trial court did not err in concluding that the applicant failed to meet his burden of proving he
was mentally retarded. The application for habeas corpus relief is denied.


Delivered February 28, 2007.

Do Not Publish.
1. See Atkins v. Virginia, 536 U.S. 304 (2002).
2. See Code Crim. Proc. art. 1.13.
3. See id., art. 37.071, § 2(a)-(g).
4. See id., § 2(h).
5. Chester v. State, No. 73,193 (January 26, 2000) (not designated for publication).
6. Ex parte Chester, WR-45,249-01 (May 31, 2000) (not designated for publication). 
7. Atkins, supra note 1.
8. 135 S.W.3d 1 (Tex. Cr. App. 2004).
9. "Mental retardation is a disability characterized by significant limitations both in intellectual functioning
and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The disability originates
before age 18.

 "Five assumptions essential to the application of the definition:

 "1. Limitations in present functioning must be considered within the context of community
environments typical of the individual's age peers and culture.

 "2. Valid assessment considers cultural and linguistic diversity as well as differences in
communication, sensory, motor, and behavioral factors.

 "3. Within an individual, limitations often coexist with strengths.

 "4. An important purpose of describing limitations is to develop a profile of needed supports.

 "5. With appropriate personalized supports over a sustained period, the life functioning of the
person with mental retardation generally will improve."

American Association of Mental Retardation, Definition of Mental Retardation (2002).
10. Health & Safety Code § 591.003(13) ("'Mental Retardation' means significantly subaverage general
intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental
period.")
11. "1. Did those who knew the person best during the developmental stage - his family, friends, teachers,
employers, authorities - think he was mentally retarded at that time, and, if so, act in accordance with that
determination?

 "2. Has the person formulated plans and carried them through or is his conduct impulsive?

 "3. Does his conduct show leadership or does it show that he is led around by others?

 "4. Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially
acceptable?

 "5. Does he respond coherently, rationally, and on point to oral or written questions or do his responses
wander from subject to subject?

 "6. Can the person hide facts or lie effectively in his own or others' interests?

 "7. Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of
that offense require forethought, planning, and complex execution of purpose?" Briseno, supra note 8, at 8-9.
12. Id., at 12.
13. Id., at 12-13.
14. Id., at 13.
15. IQ scores alone are generally not relied upon to support a diagnosis of mental retardation, but the "mild"
range of mental retardation generally implies an IQ level in the range of between 50-55 and approximately 70. See
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000);
Atkins, supra note ,1at 309 n.3.
16. Briseno, supra note 8, at 8 ("The adaptive behavior criteria are exceedingly subjective, and undoubtedly
expert will be found to offer opinions on both sides of the issue in most cases."); see also Ex parte Rodriguez, 164
S.W.3d 400, 405 (Tex. Cr. App. 2005) (reiterating same concern) (Cochran, J., concurring).
17. Briseno, supra note 8, at 8-9.
18. Code Crim. Proc. art. 11.071.