# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 19, 2009

Charles R. Fulbruge III
Clerk

No. 08-70036

KENNETH WAYNE THOMAS

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:07-cv-00039

Before DAVIS, BENAVIDES, and STEWART, Circuit Judges.

PER CURIAM:[*]

Kenneth Thomas was convicted of capital murder in 1987 and sentenced
to death. His sentence and conviction on direct review were upheld. Thomas
filed his first federal habeas petition in 2000 which was denied. Following the
Supreme Court's decision in *Atkins v. Virginia,* 536 U.S. 304 (2002), Thomas
filed a successive state habeas application alleging he was mentally retarded.
The state trial court conducted an evidentiary hearing on Thomas's allegation,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

and recommended that his claim be denied. The Texas Court of Criminal Appeals adopted the state trial court's findings of fact and denied relief.

This court granted Thomas's motion for authorization to file a successive petition for writ of habeas court on his mental retardation claim. *In re Thomas*, 225 F. App'x 222 (5th Cir. 2007). His successive petition was denied by the district court, which found that the state court's evidentiary hearing provided Thomas a full and fair opportunity to present his claims and that the state court finding that Thomas was not mentally retarded was reasonable based on the evidence. Thomas subsequently filed an application for a Certificate of Appealability (COA) on the issue of his entitlement to an evidentiary hearing and the merits of his *Atkins* claim, which the district court denied. He now applies to this court for a COA. We deny his application for a COA.

I.

Thomas must make "a substantial showing of the denial of a constitutional right" for this court to issue a COA. 28 U.S.C. § 2253(c)(2). The Supreme Court has stated the applicable standard of review in these cases as follows:

> Under the controlling standard, a petitioner must "sho [w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" [*Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983))].

*Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). In determining whether a COA should issue, a court does not have to determine that "the appeal will succeed." *Id*. at 337. Instead, the court must only ask "whether [the] resolution was debatable amongst jurists of reason." *Id*. at 336. Therefore, we must determine whether reasonable jurists could debate whether the district court should have granted Thomas's request for an evidentiary hearing. "We review [a] federal district court's refusal to grant an evidentiary hearing on the *Atkins* issue for an abuse of discretion." *Hall v. Quarterman*, 534 F.3d 365, 367 (5th Cir. 2008). "[A]

district court abuses its discretion in not holding an evidentiary hearing only if the state court failed to provide a full and fair hearing." *Id.* at 368-69.

A district court must look to the terms of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) in determining whether a petitioner is entitled to an evidentiary hearing.

> Under AEDPA, Congress prohibited federal courts from granting habeas relief unless a state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or the relevant state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

*Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Thomas does not argue that the law applied by the state court was incorrect; he only argues that the state court's determination that he is not retarded is unreasonable in light of the evidence presented to that court. "AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.' § 2254(e)(1)." *Id.* at 473-74. Therefore, the state court's determination is due deference unless Thomas points to clear and convincing evidence that he is mentally retarded. "[A] district court is not required to hold an evidentiary hearing" where the record contradicts the petitioner's factual allegations. *Id.* at 474.

## II.

As indicated above, following the Supreme Court's decision in *Atkins*, the state court conducted an evidentiary hearing on Thomas's claim that he was mentally retarded. At the hearing, Thomas presented expert testimony on his mental status to establish that he is mentally retarded. Under Texas law, a petitioner must demonstrate that he has: "(1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte*

*Briseno*, 135 S.W.3d 1, 7 (Tex. Crim App. 2004) (footnotes omitted) (acknowledging Texas has embraced the American Association on Mental Retardation's ("AAMR") definition of mental retardation); *see also Atkins,* 536 U.S. at 309 n.3 (setting forth both the AAMR's and the American Psychiatric Association's definitions of mental retardation).

The first factor, subaverage intellect, is typically established by looking to IQ tests such as the Wechsler Adult Intelligence Scale (WAIS) and finding a score of 70 or below. *See id.* at 308 n.5 (noting that, at the time, the WAIS-III was "the standard instrument in the United States for assessing intellectual functioning"); *Briseno*, 135 S.W.3d at 7 n.24. Thomas has taken three IQ tests. The first was administered in 1986 (the same year he committed the capital murder) by Dr. Lovitt. Thomas, then 25 years old, scored 75 on that test. In 1987, Dr. Hom administered another test and Thomas scored a 77. Finally, in 2003, Dr. Kessner administered the third test and Thomas, 42 years old, scored a 67. The state court concluded that the 1986 test administered by Dr. Lovitt provided "the most accurate assessment of [Thomas's] IQ." This IQ test was taken closest in time to the crime and Dr. Lovitt, who administered that test, had been hired by the defense in preparation for a competency hearing. It was also consistent with Thomas's 1987 IQ test and mental health assessments performed throughout Thomas's life. Taking the standard error of measurement into account, the state court found that Thomas's "true" IQ score was within the 70-80 range, which indicates "borderline intellectual functioning, not mental retardation."

The state court went on to consider the next element of a mental retardation claim, limitations in adaptive functioning. This is evaluated by looking at eleven factors set forth in *Atkins*: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. *Atkins*, 536 U.S. at

309 n.3. Along with these criteria, Texas courts look to additional evidentiary factors:

- Did those who knew the person best during the developmental stage - his family, friends, teachers, employers, authorities - think he was mentally retarded at the time, and if so, act in accordance with that determination?
- Has the person formulated plans and carried them through or is his conduct impulsive?
- Does his conduct show leadership or does it show that he is led around by others?
- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
- Can the person hide facts or lie effectively in his own or others' interests?
- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

The state court examined all of these factors individually and determined that Thomas did not present evidence that he had limitations in adaptive functioning. It looked at affidavits from Thomas's family members, and determined that while Thomas was slow, he did not demonstrate limitations in adaptive functioning. Thomas demonstrated organizational skills while incarcerated, successfully following a weight-loss plan and using a calender to keep track of his appeals. The state court also looked at the actions of Thomas after the crime was committed, and concluded that his disposal of the weapon and concealment of the crime demonstrated forethought, planning, and rational behavior.

The state court considered expert testimony from Thomas's expert, Dr. Garnett, who argued that an individual's adaptive strengths should not be considered in evaluating his adaptive abilities, and that only his weaknesses

should be considered when making a determination of mental retardation. The state court rejected this contention, and found that the *Briseno* factors "clearly contemplate consideration of a person's behavioral strengths as well as weaknesses." In looking at the evidence, the state court concluded that Thomas "does not have significant deficits in adaptive behavior and that applicant functions in the borderline range of intelligence."

The final element in evaluating a mental retardation claim is whether the prior two elements - subaverage intellectual functioning and deficits in adaptive functioning - were evident before the individual was 18 years old. Thomas argued that he had suffered a brain injury as a child, but the state court determined that the evidence did not support this contention. Thomas also argued that his score of 67 on the 2003 IQ test indicated that he demonstrated subaverage functioning before he was 18 years old. However, the state court found that IQ scores are generally stable through from childhood through early adulthood, and decline as a person ages, and found the score of 67, produced when Thomas was 42, was not as reliable as the test taken when he was 25. The state court determined that Thomas presented no evidence that he demonstrated either subaverage intellect or deficits in adaptive functioning before he was 18.

Overall, the state court made 249 individual findings of facts and conclusions of law at the end of its evidentiary hearing. During that hearing, Thomas presented expert testimony and other evidence to the state court, and the State presented its own evidence including expert testimony. Evidence supported the arguments of both parties, and the state court, which had the opportunity to observe witnesses and evaluate their testimony, concluded that Thomas was not mentally retarded. This conclusion was based on a reasonable determination of the facts in light of the evidence before it, and Thomas points to no "clear and convincing evidence" that this conclusion is incorrect. *See* § 2254(d)(2), (e)(1). The district court concluded that Thomas had a full and fair

6

hearing before the state trial court, and we agree. Therefore, it was not an abuse of discretion for the district court to deny Thomas's request for an evidentiary hearing, and reasonable jurists could not dispute with the district court's conclusion. *See Hall*, 534 F.3d at 368-69.

## III.

Thomas presents other specific challenges to the state court's determination that he is not mentally retarded. He argues first that a theory known as the Flynn Effect should have been applied to his IQ test scores, lowering them below the necessary 70-point threshold. He contends that the record contradicts the state's conclusion that the Flynn Effect should not be applied. He also argues that the testimony of the state's expert, Dr. Price, is internally contradictory and that our decision in *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005) required the district court to at least hold an evidentiary hearing. These arguments shall be considered in turn.

A. *The Flynn Effect*

Thomas argues that the state court erred in accepting his unadjusted IQ scores as accurate assessments of his intelligence. Instead of accepting those scores, Thomas argues that his IQ scores should be adjusted downward to account for the Flynn Effect. The Flynn Effect is a theory published by Dr. James R. Flynn that argues that IQ scores have gone up over the years, and that when a test is administered years after its publication, the results should be adjusted downward to account for the lapse in time between publication and its administration. Thomas argues that the Flynn Effect should be applied to his IQ scores, reducing them in proportion to the time elapsed since the publication date. Thomas has been tested with three different versions of the WAIS. In 1986, he took the WAIS-R, which was published in 1981. If the Flynn Effect were applied to this test, Thomas's score of 75 would be reduced to 73. In 1987, Thomas took the WAIS, which was published in 1955. Applying the Flynn Effect

to this test would reduce his score of 77 to 67. Thomas took the WAIS-III in 2003, and this version of the test was published in 1997. The Flynn Effect would reduce his score on this test from 67 to 65.

Both Thomas's expert, Dr. Kessner, and the State's expert, Dr. Price, testified about the Flynn Effect. Dr. Kessner opined that the reduction in scores based on the Flynn Effect should be applied to all of Thomas's test scores, including the 2003 test that she administered. However, she acknowledged that there is some dispute as to the applicability of the Flynn Effect, particularly with regard to individuals of low intelligence. Dr. Price gave his own opinion of the Flynn Effect, and testified that while he was aware of its existence, it was inappropriate to apply it to an individual's test scores. Price stated that the Flynn Effect captured a "group effect," not an individual one, and that there was controversy over what caused the IQ scores to rise over time.

Thomas argues that this panel's previous decision granting him authorization to file a successive federal habeas petition recognized the Flynn Effect as an accepted scientific theory. We disagree. The panel did not make a determination about the reliability of the theory or if it was applicable to Thomas. It simply said that the claim "warrant[ed] further exploration by the district court." *Thomas*, 225 F. App'x at 224. The district court conducted this exploration, and determined that the state court had made reasoned findings of fact as to the applicability of the Flynn Effect. We agree with the district court that the state court's determination that the Flynn Effect should not be applied was not unreasonable.

Thomas argues that the state court, despite its discussion and rejection of the Flynn Effect, should have made express findings that his unadjusted IQ scores represented a true measure of his intelligence. We read the state court's findings as to the reliability of the 1986 score as sufficient, and nothing more explicit was necessary. IQ tests have long been accepted by courts as evidence

in evaluating mental retardation claims. *See Atkins,* 536 U.S. at 209 n.5; *Morris v. Dretke*, 413 F.3d 484, 489 (5th Cir. 2005). Thomas's own expert acknowledged the WAIS-III is the current "gold standard" for assessing intellectual abilities. We agree with the district court that reasonable jurists would not debate that the state court's decision that the 1986 test was an accurate assessment of Thomas's IQ was reasonable based on the facts before it.

### B.   *Guidry v. Dretke*

Thomas also argues that the evidence presented at the evidentiary hearing is so contradictory that the district court should have granted an evidentiary hearing. He relies on *Guidry v. Dretke*, 397 F.3d 306, in which this circuit held that a district court did not abuse its discretion when it chose to grant an evidentiary hearing as to questions of fact presented in the state court. In that case, police, lawyers, and the defendant provided conflicting testimony, and the state court ignored the testimony  favorable to the defendant. *Id.* at 315. The State argued that the state court's silence meant the court had made "implied" findings as to the reliability of the testimony. *Id.* at 325. "[T]he district court concluded the trial court's decision 'was based on an unreasonable determination of the facts.'" *Id.* at 326. In light of this, this court held that the district court did not abuse its discretion in conducting an evidentiary hearing. *Id.* at 324.

While the record in this case does have evidence both supporting and opposing the application of the Flynn Effect, it is not analogous to the situation in *Guidry*. There, testimony of conflicting fact witnesses was completely ignored by the trial court in its findings of fact. Here, the state court considered all of the available evidence before it, and made findings that took into consideration all of the evidence. In particular, the state court considered the testimony of Dr. Price and Dr. Kessner as to the applicability of the Flynn Effect and determined that Dr. Price was more persuasive. The state court concluded that "it is not a generally accepted professional practice to automatically adjust individual IQ

scores to accommodate the group statistical concept known as the Flynn Effect." The state court also considered the testimony of Thomas's expert Dr. Garnett, and the determined that he was biased in favor of Thomas. The state trial judge reached these conclusions after observing the witnesses and considering the evidence. Once again, reasonable jurists would not debate that the state court's decision was reasonably based on the evidence before it.

IV.

Reasonable jurists would not debate the correctness of the district court's order. The district court did not err in denying Thomas an evidentiary hearing or in accepting as reasonable the state court's finding that Thomas was not mentally retarded. Therefore, Thomas's application for a COA is DENIED.